**Elton L. BURKS, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 45A03–0410–CR–479.**

Court of Appeals of Indiana.

Dec. 6, 2005.

Transfer Denied Feb. 21, 2006.

■■■■■■■

Marce Gonzalez, Jr., Merrillville, for Appellant.

Steve Carter, Attorney General of Indiana, Maureen Ann Bartolo, Deputy Attorney General, Indianapolis, for Appellee.

## OPINION

FRIEDLANDER, Judge.

Elton Burks brings a separate appeal of his two convictions for Attempted Murder[1] after a joint jury trial with co-defendant, Victor Wiggins.[2] As restated, Burks presents four issues for our review:

1. Did the trial court abuse its discretion by failing to grant Burks's motion for mistrial based upon testimony that Burks had shot someone in an incident unrelated to the offenses for which he was charged?

2. Were the jury's verdicts as to Wiggins and Burks inconsistent, thereby requiring the trial court to grant Burks's motion for judgments on the evidence as to attempted murder?

3. Was the trial court required to halt further questioning of a witness?

4. Did the sentence imposed by the trial court violate the principles of *Blakely v. Washington?*

We affirm.

The facts relevant to the appeal disclose that on July 27, 2003, at approximately 6:45 p.m., Markale Bolden was walking between 11th Street and Burr in Gary, Indiana when he saw Burks driving a white Lexus. Burks pointed a .40 caliber Glock handgun at Bolden. Wiggins was sitting in the passenger seat of the Lexus. Bolden overheard Wiggins tell Burks not to shoot Bolden because Bolden had "nothing to do with it" and is a cousin of Wiggins's girlfriend. *Transcript* at 348. Approximately 45 minutes later, Bolden rode in a car driven by Dupree Jackson to Garrett Smith's grandmother's house in Gary. Smith was outside.

A short time later, Smith and Bolden observed Burks driving the white Lexus with gold trim. Burks stared with a "hateful" look. *Id.* at 57. Wiggins was in the passenger seat. Smith had known Burks for approximately ten years and had known Wiggins for approximately seven years. Bolden knew Burks for approximately fifteen years and had known Wiggins for approximately seven years.

After Burks drove by, Smith sat on a car parked on the street and waited for Bolden to walk over. Within a few minutes Smith heard a noise that he thought was attributable to "fireworks." *Id.* at 62. He walked toward the noise. Then he saw "dust flying up from the concrete and [saw] . . . Burks in his yellow shirt, [and Wiggins] in his . . . black and red shirt." *Id.* at 61. Burks and Wiggins had "assault-type weapons" pointed at Smith and Bolden. *Id.* at 118. When Smith saw Burks and Wiggins with the weapons, Smith "took off running and they started jogging toward" him. *Id.* at 64. Burks

---

1. Ind.Code Ann. § 35–41–5–1 (2001) (attempt); Ind.Code Ann. § 35–42–1–1 (2001) (murder).

2. Burks's and Wiggins's appeals were consolidated for the purpose of filing one transcript from their joint trial. The appeals, however, are separate and have been assigned separate cause numbers. Wiggins's appeal is No. 45A03–0409–CR–416.

and Wiggins were firing the guns at Smith and Bolden.

Before Bolden heard the shooting start, he heard someone state, "Repent from redemption and recognize me as the Lord Prince Amin." *Id.* at 252. Bolden knew that Burks referred to himself as "Prince Amin." *Id.* at 253. Immediately thereafter, Bolden heard gunshots.

After Smith had initially walked southbound toward the shots, he turned and ran in the same direction as Bolden. They both ran northbound toward a church and a field. Smith ran "straight up the sidewalk, then got in the street, because the gunfire got heavy . . . ." *Id.* at 65. Smith was shot in the hand. He continued to run through a field until he collapsed after being shot in the hip.[3] Smith "laid all the way on the ground because [he] was still hearing shots." *Id.* at 67.

Bolden ran up the street toward the church. When he neared the doorway, he was shot in his upper arm. Bolden continued to run. He was shot again in the forearm. He heard a voice that he knew to be Wiggins's shout an obscenity at him. Bolden heard shots that sounded as though two different caliber weapons were being fired—a small caliber weapon and an assault rifle. Bolden continued running; however, he was bleeding and began to feel weak. After kneeling near some shrubs, he proceeded to a fire station for assistance. An ambulance was called.[4]

Smith's uncle and a friend came to assist Smith in the field and an ambulance arrived. A police officer was able to question Smith briefly while Smith was in the ambulance. Smith was able to tell the officer that Elton Burks shot at him and gave a description of the car Burks had been driving. Smith was questioned further at the hospital.

Later that evening, while the investigation was ongoing, a police officer saw a white Lexus near the church where Bolden was shot. Burks was driving, and he was still attired in the yellow shirt he had been wearing earlier. The front-seat passenger was wearing a black shirt. From the silhouettes, it appeared that a third person was in the back seat. The officer activated the lights on the squad car he was driving and attempted to stop the Lexus. Burks slowed the Lexus, then "accelerated through the intersection." *Id.* at 387. Burks continued to accelerate, driving through stop signs and traffic signals without attempting to slow or stop. Several police officers in squad cars joined the pursuit. At one point, Burks's Lexus almost struck one of the squad cars; the officer was able to see Burks driving and saw that the front-seat passenger was wearing a black shirt. He also observed a woman in the back seat wearing a yellow shirt. Because the officers were slowing at traffic signals and signs, they lost sight of the Lexus.

An auxillary police officer then reported that people were running through his yard. The officers arrived in the area and observed Wiggins wearing a black shirt and black pants, and a woman wearing a yellow shirt. The two were walking on the side-

---

**3.** Smith was admitted to the hospital for three days. At trial, Smith explained the injury to his hand:

I can use these two fingers (indicating). . . . I can use my middle finger, but it only moves off the ligaments from this finger and this finger (indicating). . . . I don't have no—actual movement—they had to cut a piece of my bone because it shot all the knuckles and stuff out.

*Id.* at 80–81. Smith also received extensive injuries to his hip.

**4.** Bolden was in the hospital for three days and underwent surgery on his arm. He lost some mobility in his arm as a result of the shooting.

walk, but they seemed to be out of breath as though they had been running. One officer recognized Wiggins as the front-seat passenger in the Lexus. The woman, Jacqueline Adamson, identified herself as Wiggins's sister. Both Wiggins and Adamson were arrested. Burks was discovered nearby when he was running across the street and almost collided with a squad car. Burks was arrested. Shortly thereafter, the officers discovered the Lexus parked two or three blocks from the location of the arrests.

One of the officers at the scene, Officer Ryan Martens, began to inventory the items within the Lexus prior to it being towed. He discovered a small amount of marijuana in the door handle. When he discovered $3,360 cash in the center console of the Lexus, Officer Martens stopped the inventory search and had the car towed to the crime scene investigation ("CSI") garage. *Id.* at 477.

Burks was charged with two counts of attempted murder and two counts of battery, as class C felonies. Wiggins was charged with the same offenses.

At Burks and Wiggins's jury trial, Bolden testified that prior to the shooting, at a time when he and Smith were on friendlier terms with Burks, Burks had commented that "he had problems with Garrett Smith and that he was going to knock off his block." *Id.* at 297. Bolden further testified that Burks then included Bolden in the threat. At the conclusion of the trial, Burks was convicted on all counts. Wiggins was found not guilty of the two attempted murder counts, but he was found guilty of the two battery counts.

On August 19, 2004, Burks's sentencing hearing was held. The trial court found no factors in mitigation of Burks's sentence. The trial court found five aggravating factors. The court imposed two thirty-eight-year sentences for the two at-tempted murder convictions and ordered the sentences to be served consecutively. The trial court did not enter judgments upon the two battery charges.

1.

Burks contends that the trial court abused its discretion by failing to grant his motion for a mistrial based upon Smith's testimony that Burks had shot someone in an incident unrelated to offenses at issue at trial. Specifically, Burks urges that the trial court erroneously allowed a jury question directed to matters he had successfully sought to have excluded through a motion in limine. Burks, in essence, argues that the trial court's ruling allowing the juror's question inappropriately allowed Ind. Evid. Rule 614, regarding juror's questions, to override the weighing process of Ind. Evid. Rules 403 and 404(b) with regard to relevance and the admission of evidence of other bad acts. Thus, according to Burks, the evidence of the uncharged shooting of a person other than Smith and Bolden "created the forbidden inference which Rule 404 is designed to prevent. Namely, if Burks shot another person, he is more likely to have shot Smith and Bolden." *Appellant's Brief* at 9.

At the trial, the jurors submitted written questions for the witnesses. After Smith testified, two jurors submitted proposed questions as to whether Smith knew "the reason that Burks and Wiggins would want to shoot you". *Transcript* at 211. Burks objected on the ground that the answer would likely lead to matters that had been excluded by the grant of the motion in limine; specifically, the evidence that Burks had asked Smith to join his gang and sell drugs. The trial court acknowledged the possibility of such but indicated the question should be posed to Smith because identity and motive were at issue. The trial court stated:

It's a highly relevant question. This issue is identi[t]y. The question goes to his motive. I'm looking at rule 404 at this time. And, quite frankly, I think that it is, in fact, a proper question, in light of the—the defense has been raised, the issue is before the jury. And, quite frankly, everything that I've heard, this raises—I understand that this is going to raise a lot of issues that were not already discussed by either side, but it's a question by the jury. I think the court of appeals have to now deal with the consequences of allowing these juror questions. We had a motion in limine. [The State] was not going to get into it. But in light of what I've heard as a result of the evidence that has come in thus far, I believe that rule 404, in terms of identity and motive, makes this a very relevant question. And I understand that by allowing this— I will give you ample opportunity to flush it out, but I don't think I can keep it out at this point. So, I've made my ruling and this question will be asked.

*Id.* at 202–203.

The trial court reasoned that considering Evid. R. 404(b) and balancing relevance against potential prejudice pursuant to Evid. R. 403, the question should be submitted to Smith. The trial court also denied Burks's motion to consider the matter and submit the question to Smith outside of the presence of the jury.

■ When asked, Smith stated that Wiggins was just "following Burks." *Id.* at 211. As for Burks, Smith offered that

he had not given Burks "the response ... he wanted" when Smith turned down a proposition. *Id.* The parties were allowed to ask questions based upon Smith's response. The following colloquy occurred when the State questioned Smith on redirect examination:

Q. ... And what did he want from you?

A. He wanted me to sell his dope, join his shit—his gang.

Q. He wanted you to join his gang?

A. Yes, he offered me a proposition, tried to give me a key for 21,000. I heard what he said, it went in one ear, out the other. I never said nothing else to him. And then—that was in 2002. And then in 2003 he wanted me to go ride with him against Avery, he went and shot this dude in the neck.

*Id.* at 211–212.[5] At that point, Burks's counsel objected and moved for a mistrial. The trial court denied the mistrial and agreed to admonish the jury that the last portion of the answer "was an improper response to the question initially asked by [the State]. And I am instructing you absolutely to disregard from any consideration the last portion of this witness' answer...." *Id.* at 217.

■ We are called upon to analyze the intersection between Jury Rule 20 in conjunction with Evid. R. 614, allowing jurors to pose questions to witnesses, and Evid. R. 403 and 404(b), regarding the admissibility of evidence of uncharged bad acts.[6] In pertinent part, Jury Rule 20 provides:

---

5. Burks alludes to an evidentiary harpoon. "An evidentiary harpoon is the placing of inadmissible evidence before the jury with the deliberate purpose of prejudicing the jurors against the defendant." *Kirby v. State*, 774 N.E.2d 523, 535 (Ind.Ct.App.2002) (citation omitted).

6. Because the purpose of a motion in limine is to prevent the jury's exposure to prejudicial material prior to the trial court having an opportunity to rule on its admissibility and because a favorable ruling on a motion in limine does not serve as the ultimate determination on admissibility, Burks does not have

(a) The court shall instruct the jury before opening statements by reading the appropriate instructions which shall include at least the following:

(7) that jurors may seek to ask questions of the witnesses by submission of questions in writing

In relevant part, Evid. R. 614 provides:

(d) A juror may be permitted to propound questions to a witness by submitting them in writing to the judge, who will decide whether to submit the questions to the witness for answer, subject to the objections of the parties, which may be made at the time or at the next available opportunity when the jury is not present. Once the court has ruled upon the appropriateness of the written questions, it must then rule upon the objections, if any, of the parties prior to submission of the questions to the witness.

Although the concept of jurors posing questions to witnesses was not new to Indiana when Jury Rule 20 was adopted, effective January 2003, courts on review have had few opportunities to offer guidance on the issue. *See Ashba v. State*, 816 N.E.2d 862 (Ind.Ct.App.2004). In the present case, the trial court's ruling can be read to indicate that the trial court thought that questions by jurors are entitled to weight not accorded to parties' questions when making the determination whether an objection should be sustained.

▪ In *Ashba*, this court addressed the proper procedure for allowing jurors to pose questions. *Ashba v. State*, 816 N.E.2d 862. We noted: "We see no reason why the procedure approved by this court under Rule 614(d) cannot be used, likewise, under Jury Rule 20." *Id.* at 866. As set out above, the procedure within Evid. R. 614 includes two filters through which the juror questions must flow: 1) the trial court initially determines whether the juror questions are appropriate, 2) then, questions that are deemed appropriate are still subject to the trial court's ruling when the parties object. *See* Evid. R. 614(d). Further, the decision whether to propound a question submitted by a juror is a determination that rests within the trial court's discretion. *Dowdy v. State*, 672 N.E.2d 948 (Ind.Ct.App.1996), *trans. denied.*

▪ In *Trotter v. State*, 733 N.E.2d 527, 531 (Ind.Ct.App.2000), *trans. denied*, we stated that a proper juror question is one that "allows the jury to understand the facts and discover the truth." We then explained:

Finally, we do not mean to say that every juror question which leads to the discovery of the truth or aids in the understanding of the evidence must be submitted. Not only must the answer clarify evidence for the jury but it also must be admissible under our rules of evidence.

*Id.* at 532. Thus, questions propounded by jurors are entitled to no less scrutiny under our rules of evidence than those propounded by parties. Arguably, the two filters built into the procedure subject juror questions to additional scrutiny.

▪ Having established that the trial court was bound to consider the jurors' question under the rules of evidence, we

---

any ground for error based upon the trial court's ultimate determination that the evidence would be admissible after having granted the motion in limine. *See Willingham v. State*, 794 N.E.2d 1110 (Ind.Ct.App.2003). "If the trial court commits error in admitting evidence that the defendant sought to be excluded by a motion in limine, the error lies in the admission of evidence at trial, not in a violation of the trial court's pretrial ruling." *Id.* at 1116.

turn to an examination of Evid. R. 404(b). In relevant part, Evid. R. 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]

The consideration of the admissibility of evidence under Evid. R. 404(b) entails the relevancy test of Evid. R. 401 and the balancing test of Evid. R. 403. *Willingham v. State*, 794 N.E.2d 1110 (Ind.Ct. App.2003).

> Pursuant to Evid. R. 401, evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Nevertheless, under Evid. R. 403, the trial court may exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

*Id.* at 1116 (citations omitted). The trial court enjoys broad discretion in weighing the probative value of the evidence against the potential for prejudice. *Id.* The trial court's determination, when based upon the balancing test within Evid. R. 403, is reviewed for an abuse of discretion. *Id.* No less so after the adoption of Jury Rule 20.

Here, the trial court clearly outlined its intention to engage in a weighing process of relevance and potential prejudice to the defendant, albeit with a nod to the supposed implication of the jury rule's import. It is noteworthy that Burks's objection to the jury question, the parties' resulting discussion, and the trial court's ruling all indicated that the potentially prejudicial evidence to be balanced for relevance and harmful effect was expected to revolve around the issue of illicit drug activity. To be sure, Smith did testify as to Burks's involvement in the illicit drug trade.[7] Unexpectedly, however, Smith also testified regarding Burks's uncharged act of shooting another person. We cannot determine that the trial court's balancing analysis was faulty based upon the wrong supposition regarding the potentially damaging evidence. Neither can we ignore Burks's request for a mistrial based upon the lack of a nexus between the shooting of Avery and motive or identity in the shootings in the present case.

"A mistrial is an extreme remedy warranted only when no other curative measure will rectify the situation." *Harris v. State*, 824 N.E.2d 432, 439 (Ind.Ct. App.2005). A trial court's determination whether to grant a mistrial is afforded great deference, as it is in the best position to gauge the circumstances and probable impact upon the jury. *Id.* In order to prevail on appeal from the denial of a motion for mistrial, a defendant must establish that the questioned information or event was so prejudicial and inflammatory that he was placed in a position of grave peril to which he should not have been subjected. *Id.* "The gravity of the peril is determined by the probable and persuasive effect on the jury's decision." *Mote v. State*, 775 N.E.2d 687, 689 (Ind.Ct.App. 2002), *trans. denied.* "Moreover, reversible error is seldom found when the trial

---

7. Inasmuch as other corroborative evidence of Burks's drug activity was admitted into evidence without objection, Burks does not specifically contend that the evidence of the illicit drug activity would form a basis for error.

court has admonished the jury to disregard a statement made during the proceedings." *Warren v. State*, 757 N.E.2d 995, 999 (Ind.2001) (quoting *Bradley v. State*, 649 N.E.2d 100, 108 (Ind.1995)).

Burks urges that he was placed in a position of grave peril in which he should not have been placed and that the admonition given here could not have repaired the damage. Burks relies upon the language in *Bonner v. State*, 650 N.E.2d 1139 (Ind.1995):

> The presence of jury admonitions may be considered in determining whether an error is harmless. However, the simple fact that an admonition is given does not necessarily mean that particularly prejudicial, erroneously admitted evidence will be erased from the minds of reasonable jurors or omitted from their deliberations.

*Id.* at 1142.

"In any event, evidence admitted in violation of Evidence Rules 402, 403, or 404 will not require a conviction to be reversed 'if its probable impact on the jury, in light of all of the evidence in the case, is sufficiently minor so as not to affect a party's substantial rights.'" *Houser v. State*, 823 N.E.2d 693, 698 (Ind. 2005) (citations omitted). When the brief reference to the other shooting is viewed in light of the overwhelming evidence of Burks's guilt in this case, its admission

into evidence can safely be relegated to the status of harmless error. Smith and Bolden both testified that they had known Burks for a significant period of time, they both recognized Burks as he drove by them in the white Lexus, Smith saw Burks with Wiggins carrying weapons and shooting at him and Bolden, and Bolden heard someone referring to himself as Prince Amin—a moniker adopted by Burks—all as a hailstorm of bullets rained down on him and Smith. Further, later, on the same evening as the shootings, the police discovered Burks with Wiggins attired in the same clothing as they had been wearing during the shootings, driving by the scene of the investigation in the white Lexus. Burks drove away from the police, after initially indicating, by slowing the car, that he would stop. Burks and Wiggins were arrested after they abandoned the Lexus. It is apparent that the probable impact of the evidence as to another shooting was sufficiently minor so as not to affect Burks's substantial rights. *See Houser v. State*, 823 N.E.2d 693.

### 2.

Next, we turn to Burks's contention that the jury verdicts finding him guilty of two counts of attempted murder and finding Wiggins, his co-defendant, not guilty on the attempted murder charges are irreconcilably inconsistent.[8] Burks urges that the trial court erred by failing

---

**8.** In Indiana, the majority of cases that refer to "inconsistent" verdicts stem from allegations that the pending charges against one defendant do not lend themselves to findings of guilt if the defendant is acquitted on other related charges. *See e.g. Owsley v. State*, 769 N.E.2d 181 (Ind.Ct.App.2002), *trans. denied.* When multiple defendants exist and there is an allegation of inconsistency, often the defendants were charged with *conspiracy* to commit a crime. *See Minniefield v. State*, 512 N.E.2d 1103 (Ind.1987) (no inconsistency in verdicts where all co-conspirators tried to-

gether and only defendant was convicted of conspiring with undercover officer to commit murder); *see also* Ind.Code Ann. § 35–41–5–2 (West 2002) (defining conspiracy and providing that it is not a defense "that the person with whom the accused person is alleged to have conspired: (1) has not been prosecuted; (2) has not been convicted; (3) has been acquitted; (4) has been convicted of a different crime; (5) cannot be prosecuted for any reason; or (6) lacked the capacity to commit the crime.").

to grant his motion for a judgment on the evidence based upon the inconsistency.

In *Willard v. State,* 272 Ind. 589, 400 N.E.2d 151 (1980), our Supreme Court determined that there existed no need for consistency where the separate trials of two defendants charged as principals in the same felony murder ended in the acquittal of one defendant and a guilty verdict as to the other. Although Burks and Wiggins were tried jointly, the same result should obtain here.

The most compelling reason that we do not find a need for consistency, if consistency is defined here as the jury returning the same verdicts for both defendants, is based upon the mens rea component of attempted murder. To convict Burks and/or Wiggins of attempted murder, the jury was required to find that Burks and/or Wiggins acted with the specific intent to kill the victims. *See Osborne v. State,* 754 N.E.2d 916 (Ind.2001). Whereas, the battery convictions required only that the jury determine that Burks and Wiggins knowingly or intentionally touched the victims in a rude, insolent, or angry manner, which resulted in serious bodily injury to the victims. *See* I.C. § 35–42–2–1.

Smith and Bolden explicitly testified that Burks had made threats about harming them. Moreover, they testified that Wiggins had acted in a manner that was not consistent with the specific intent to kill them. Smith testified regarding Burks's "hateful stare" as he drove by Smith and Bolden minutes prior to the shootings. *Transcript* at 57. Smith testified that he did not initially name Wiggins as one of the shooters because Wiggins was a "follower." *Id.* at 150. Smith indicated that Wiggins was less culpable. Bolden testified that Wiggins had interceded on his behalf earlier in the day when Burks aimed a .40 caliber Glock handgun

at Bolden. The different conclusions by the jury as to Burks's and Wiggins's convictions indicate that the jury carefully assessed the evidence and the instructions to discern each defendant's intent.

Burks's argument suggests that in order for the jury to return different verdicts as to Wiggins and Burks on the attempted murder counts, the jury was required to find that only Burks's shots struck the victims. Burks is mistaken. As noted above, the pivotal distinction is the intent of the defendants as they shot at the victims.

To the extent that Burks's claim of inconsistency is tantamount to a claim that his convictions are not supported by sufficient evidence, as required by our standard of review, we decline the invitation to reweigh the evidence. When reviewing a challenge to the sufficiency of the evidence, this court does not reweigh the evidence or assess the credibility of witnesses and will consider only the evidence favorable to the judgment together with all reasonable inferences from that evidence. *McHenry v. State,* 820 N.E.2d 124 (Ind. 2005). Here, the jury was presented with substantial evidence, as recited above, to explain and sustain the jury's determination to convict only Burks of attempted murder. Thus, the trial court did not err by denying Burks's motion for a judgment on the evidence based upon the different verdicts.

3.

Next, as best we can discern, Burks urges that the trial court should have stopped the questioning of Bolden by the State on redirect regarding the .40 caliber Glock handgun because, according to Burks, the testimony was obviously false. Also, Burks contends that the admission of evidence surrounding the incident with the Glock handgun was prejudi-

cial resulting in a violation of Evid. R. 404(b).

■ Here, the possible violation of Evid. R. 404(b) was not properly preserved because Burks did not object to the admission of the evidence on that ground at trial. "A defendant may not object on one ground at trial and raise another on appeal; any such claim is waived." *Houser v. State,* 823 N.E.2d 693.

■ As noted by the State, Burks's other ground for error with regard to the Glock incident seems, at its essence, to be a complaint that damaging evidence against Burks was elicited by both defense counsel and the State. During Burks's cross-examination of Bolden, Bolden stated that earlier on the day of the shootings, Burks had pointed a .40 caliber Glock handgun at him. Burks's counsel pursued the line of questioning, noting that Smith had not reported seeing a .40 caliber Glock handgun, to which Bolden responded: "Garrett Smith wasn't on 11th and Burr Street." *Transcript* at 317. Subsequently, during cross-examination of Bolden by Wiggins's counsel, he was again asked about the .40 caliber Glock handgun. Then, on redirect, Bolden testified that Burks threatened him with the .40 caliber Glock handgun and that Wiggins had interceded on his behalf. Burks's counsel questioned Bolden further on recross:

> Q. Well, I have a problem knowing what you're saying, Mr. Bolden. You were asked on July 28th, 2003, 2:40 p.m. [at the hospital], "have you ever had any problems with Elton Burks and Victor Wiggins?" And you told us about this situation at the gas station—you told Detective Fazekas, "Elton Burks threatened me at the gas station because I was with Garrett Smith. He don't like Garrett." You didn't say anything about by the way, yesterday afternoon I was 11th and Burr, somewhere out there, he came by and pointed this 40–caliber Glock at me and said I ought to take care of you right now.
>
> A. Right.

*Id.* at 349. Bolden, never wavered as to his contention that he did not inform the police of the Glock incident; he stated, however, that he had informed the deputy prosecutor. Only after the extended examination by both defense counsel and the State did Burks's counsel ask to approach the bench to determine whether the State had taken a statement from Bolden regarding the .40 caliber Glock handgun. The deputy prosecutor acknowledged that Bolden had "indicated to me just recently that a handgun was ... pointed at him in a car earlier that day." *Id.* at 351–52. The deputy prosecutor clarified that Bolden had not specified that the handgun was a .40 caliber Glock. Burks's counsel urged that Bolden was lying. The trial court indicated that Bolden's credibility was at issue on cross-examination. When Burks's counsel resumed cross-examination he posed a question to Bolden that in essence indicated that the deputy prosecutor had denied that Bolden had told him about the Glock-incident[9] and asked Bolden "what would you say about that?" *Id.* at 356. Bolden responded: "it would make it seem like I'm lying under oath." *Id.*

First, we disagree that the evidence demonstrates that Bolden lied about seeing the .40 caliber Glock handgun earlier in the day, or lied about telling the deputy prosecutor about the incident. The course of the examination of Bolden and the sidebar indicate only that a miscommunication

---

**9.** It appears that the question posed to Bolden mischaracterized the deputy prosecutor's statement at the sidebar.

existed as to whether the handgun type was specified, not whether Bolden told the deputy prosecutor about the incident.

Second, defense counsel opened the line of questioning, and pursued examination of Bolden on the Glock incident. "A party may not invite error, then later argue that the error supports reversal, because error invited by the complaining party is not reversible error." *Booher v. State*, 773 N.E.2d 814, 822 (Ind. 2002). Also, the trial court is vested with broad discretion in determining the scope and extent of cross-examination, or as in this case, the scope of redirect examination. *See Smith v. State*, 765 N.E.2d 578 (Ind.2002). As noted by our Supreme Court, "[t]he scope of permissible cross-examination extends to all phases of the subject matter covered in direct examination and may include any matter which tends to elucidate, modify, explain, contradict, or rebut testimony given in chief by the witness." *Id.* at 588 (citation omitted). Further, "once a party opens up a subject on direct examination, he can not close the subject to cross-examination at his own convenience." *Id.* The reasoning is equally applicable here to cross-examination and redirect examination of the witness.

Third, it is evident that Burks accomplished precisely his goal on cross-examination, *i.e.*, to place Bolden's credibility at issue. In fact, Bolden's last statement appeared to concede that either he was lying or the deputy prosecutor had lied. We fail to see any error in the trial court's actions or inactions regarding the Glock incident.

4.

Finally, Burks contends that his enhanced sentence violated the tenets of *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). At Burks's sentencing, his counsel objected to certain aggravating factors on *Blakely* grounds.

The trial court's sentencing order dated August 19, 2004, provided, in part:

*MITIGATING CIRCUMSTANCES:* The Court considers the following factors as mitigating circumstances or as favoring suspending the sentence and imposing probation: the court finds nothing in mitigating factors.

*AGGRAVATING CIRCUMSTANCES:* The Court considers the following factors as aggravating circumstances or as favoring imposing consecutive terms of imprisonment:

1. The defendant has a history of criminal activity as follows: April 1991—Case: 45G01–9010–CF–00184, Battery, a felony, for which the defendant was sentenced to the Department of Correction for a term of five years, two years suspended, two years probation after his release, and for which he violated said probation; November 1993—Case 45G01–9304–CF–00099, Criminal Recklessness and Possession of a Handgun without a License, both felonies, for which the defendant was sentenced to the Department of Correction for a term two years each count, concurrently, but consecutive to Case 45G01–9010–CF–00184; the above named offenses were committed while the defendant was on probation in Case 45G01–9010–CF–00184; and February 4, 2002—Case 45D09–9908–CM–10019, Visiting a Common Nuisance, a misdemeanor, for which he received a probationary term.

2. The defendant is in need of correctional or rehabilitative treatment that can best be provided by his commitment to a penal facility for the following reason: because of his prior criminal history.

3. The defendant has had a significant history of arrests including a number of

pending felony cases with the State of Indiana and the Federal Court.

4. Prior leniency has had no deterrent affect (sic) on the defendant's conduct in terms of committing future criminal offenses.

5. The shootings of both victims caused permanent, life altering injuries to each of the victims.

The court finds that each aggravating factor, standing alone, in and of themselves, outweigh any mitigating factor. *Appendix* at 153. The court sentenced Burks "to a term of Counts I and II: thirty-eight (38) years in each count. Said sentences are ordered served consecutively. Counts III and IV are merged into Counts I and II.... The Court orders the defendant committed to the Department of Correction for a term of seventy-six (76) years." *Id.* at 152.

Burks specifically contends that four of the five aggravating factors violated the tenets of *Blakely v. Washington,* in that a jury was required to find all aggravating factors except the factor regarding Burks's criminal history. He asserts that the criminal history alone should not support the eight-year enhancement for each conviction or the imposition of consecutive sentences. Burks urges that "given the highly inconsistent verdicts reached by the jury resulting in Wiggins['s] acquittals on the same charges, the sentences should be ordered to be served concurrently." Burks requests the imposition of concurrent 30–year sentences for each count. Burks does not, however, argue that the trial court erred by failing to find factors in mitigation.

At the time of the instant offenses, Ind. Code Ann. § 35–50–2–4 (2001),[10] provided: "A person who commits a Class A felony shall be imprisoned for a fixed term of thirty (30) years, with not more than twenty (20) years added for aggravating circumstances or not more than ten (10) years subtracted for mitigating circumstances ...." Here, Burks's sentences for attempted murder were enhanced by eight years and ordered to be served consecutively.

◼ The Court in *Blakely* applied and refined the rule of *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403. "Other than the fact of a prior conviction, a fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 2536 (quoting *Apprendi v. New Jersey,* 530 U.S. at 490, 120 S.Ct. 2348). "[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Blakely v. Washington,* 124 S.Ct. at 2537 (emphasis in original).

◼ *"Blakely* is not concerned, primarily, with what facts a judge uses to enhance a sentence, but with how those facts are found." *Trusley v. State,* 829 N.E.2d 923, 925 (Ind.2005). Pursuant to *Blakely,* "a trial court in a determinate sentencing system such as Indiana's may enhance a sentence based only on those facts that are established in one of several ways: 1) as a fact of prior conviction; 2) by a jury beyond a reasonable doubt; 3) when admitted by a defendant; and 4) in the course of a guilty plea where the defendant has waived *Apprendi* rights and stipulated to certain facts or consented to

---

**10.** Indiana's sentencing statutes were amended by P.L. 71–2005, sec. 7, with an emergency effective date of April 25, 2005, to alter "presumptive" sentences to "advisory" sentences.

judicial factfinding." *Id.* Thus, where as here the defendant did not admit facts through a guilty plea, without violating *Apprendi* and *Blakely,* sentences may be enhanced based upon facts reflected in the jury's verdict, facts admitted by the defendant, and the fact of a prior conviction.

 Examination of the aggravating factors recited by the court indicates that three of the five factors relate to criminal history. Here, the aggravating factor regarding the severe injuries sustained by the victims would be a matter that implicates *Blakely* inasmuch as that factor was not determined by the jury, conceded by the defendant, or a part of his criminal history. *See Wright v. State,* 829 N.E.2d 928 (Ind.2005) (the severity of the injuries sustained by the victims, although grievous and obvious, is a matter that implicates *Blakely v. Washington* ). Further, we do not agree with the State's assessment that Burks's arrests after the offenses in the present matter constituted a valid aggravating factor based upon Burks's failure to challenge their existence in the presentence investigation report. Accordingly, we will not consider either of those factors. Thus, we are called upon to determine whether criminal history alone would support the imposition of the enhanced sentences in this case.

 We note, the trial court specifically determined that it considered any one of the aggravating factors to be sufficient to support the enhanced sentences. Also, at the sentencing hearing, the trial court stated significant emphasis was accorded to Burks's criminal history. A single proper aggravating factor can support a sentence enhancement. *See Powell v. State,* 769 N.E.2d 1128 (Ind.2002); *but see Trusley v.*

*State,* 829 N.E.2d at 927 (noting that existence of a single aggravator "does not relieve trial or appellate judges from the obligation to consider what weight to assign a particular aggravator and to balance the aggravators and mitigators."). In this case, examining the properly found aggravator regarding Burks's criminal history against the court's conclusion that no mitigating circumstances existed, a fact not challenged by Burks on appeal, we are able to say with confidence that the enhanced sentence should be affirmed on appeal.[11]

Affirmed.

SULLIVAN, J., and VAIDIK, J., concur.

**M.L., Appellant–Defendant,**

v.

---

**11.** Our Supreme Court has determined that consecutive sentences do not implicate *Blakely. See Wright v. State,* 829 N.E.2d 928; *Smylie v. State,* 823 N.E.2d 679 (Ind.2005). The imposition of consecutive sentences requires the existence of at least one aggravating factor. *See Smylie v. State,* 823 N.E.2d 679.