## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 19 2015, 9:34 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Philip R. Skodinski
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Javon Crockett-Berry,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

March 19, 2015

Court of Appeals Case No.
71A03-1407-PC-242

Appeal from the St. Joseph Superior Court
The Honorable Jane Woodward Miller, Judge
Cause Nos. 71D01-0611-PC-36, 71D01-0401-MR-1

**Bradford, Judge.**

## Case Summary

[1] In July of 2001, Appellant-Defendant Javon Crockett-Berry ("Crockett") took part in an attempted burglary of a drug dealer's residence. Crockett and his co-

conspirators mistakenly targeted the wrong house, the burglary went awry, and Mary Lou Wolfe was killed. Crockett was implicated in the murder by several witnesses, and police found Crockett's DNA at the crime scene. On September 26, 2005, a jury found Crockett guilty of felony murder and burglary. The trial court sentenced Crockett to an aggregate term of sixty years of imprisonment. Crockett appealed but subsequently requested that the matter be remanded to the trial court pursuant to the *Davis-Hatton*[1] procedure, which was granted by this court. Crockett filed his first petition for post-conviction relief ("PCR") in 2006. After two subsequent amendments to his petition, the PCR court held evidentiary hearings and denied Crockett relief. On appeal, Crockett claims that the trial court erred in admitting and excluding certain evidence, that Appellee-Plaintiff the State of Indiana ("the State") was guilty of prosecutorial misconduct and *Brady* violations[2], and that his trial counsel was ineffective. We affirm.

# Facts and Procedural History

---

[1] The *Davis-Hatton* procedure involves a termination or suspension of a direct appeal already initiated, upon appellate counsel's motion for remand or stay, to allow a post-conviction relief petition to be pursued in the trial court. *State v. Lopez*, 676 N.E.2d 1063, 1069 (Ind. Ct. App. 1997) (citing *Hatton v. State*, 626 N.E.2d 442 (Ind. 1993), *trans. denied*; *Davis v. State*, 267 Ind. 152, 368 N.E.2d 1149 (1977)). See also Ind. Appellate Rule 37(A) ("At any time after the Court on Appeal obtains jurisdiction, any party may file a motion requesting that the appeal be dismissed without prejudice or temporarily stayed and the case remanded to the trial court … for further proceedings. The motion must be verified and demonstrate that remand will promote judicial economy or is otherwise necessary for the administration of justice.")

[2] In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. 83, 87 (1963).

[2] Sometime in early July of 2001, Frank Moffitt was wanted for drug and gun charges, and, in a stolen car, Moffitt drove to South Bend in hopes of committing a robbery. While in South Bend, Moffitt was staying with Teresa Avance, who was the mother of his child. After Moffitt explained his situation to Avance, he asked her if she knew anyone who would be interested in helping him conduct a robbery. Avance then introduced Moffitt to her cousin, Crockett. Moffitt and Crockett decided to rob a drug dealer, DeShawn Works, who also lived in South Bend. Moffitt and Crockett enlisted the help of Tyson Crawford who showed Moffitt where Works's house was located. Sometime in the early morning hours of July 8, 2001, Moffitt, Crockett, and Ricky Phillips approached what they believed to be Works's home from the back alley. However, the house which the group believed to belong to Works actually belonged to Walter and Mary Lou Wolfe, who lived next door to Works. Phillips stayed in the car while Moffitt and Crockett, each of whom was carrying a gun, approached the back door of the Wolfes' house. Crockett entered the house through the back door while Moffitt waited outside.

[3] At approximately 1:00 a.m., Walter awoke to a sound coming from the stairs. Moments later, Walter saw a silhouette through the bedroom doorway. Walter yelled at the figure, "Get out of my house." Tr. p. 337. The figure responded by firing two shots into the room. Walter waited a moment and then went across the hall and called 911. After calling for help, he returned to the bedroom and realized that Mary Lou had been shot. Walter then called 911 a second time and requested an ambulance. Officers arrived soon thereafter and found a lit

cigarette on the ground near the back door which they collected as evidence. Mary Lou died as a result of a single bullet wound to the upper back/shoulder area which severed her spinal cord.

[4] After the shooting, Crockett exited the house and returned to the car with Moffitt. While driving away, Moffitt asked Crockett what happened in the house. Crockett told Moffitt that someone jumped up and he shot at them. Crockett returned to Avance's home and told her "he did something wrong." Tr. p. 626. Sometime thereafter, Crockett told Avance "he [thought] he killed the wrong person." Tr. p. 628.

[5] In August of 2001, St. Joseph County Police received a Crime Stoppers tip which led then-Officer Keith Hadary[3] to speak with Crockett. When asked about Wolfe's murder, Crockett told Captain Hadary, "I didn't kill that white b****." Tr. p. 771. Prior to Crockett's statement, officers had not given Crockett any specifics about Wolfe including her race. The case went unsolved until cold case Investigator Timothy Decker interviewed Moffitt in 2004. Moffitt agreed to discuss the case on the condition that he be given immunity. The State agreed and in a January 14, 2004 letter, the State offered Moffitt complete immunity from "any drug related matters, murder in any degree or false informing charges, which may be part of this homicide investigation."

---

[3] Prior to trial, Hadary was promoted to Sergeant and later promoted to Captain before the PCR hearing. Unless quoting directly from the trial or PCR court records, we will hereafter refer to him as "Captain Hadary."

State's Ex. 43. On January 20, 2004, the State charged Crockett with murder, Class B felony burglary, and felony murder. When Crockett was interviewed again in 2004, he denied having been at Wolfe's house and stated that he had been shot in the face on June 30, 2001, which caused him to be "laid up for two months." Tr. p. 977.

[6] At trial, Moffitt, Avance, and Phillips testified and implicated Crockett in the murder. The State introduced evidence that Crockett's DNA was present on the cigarette found near the backdoor of the Wolfes' house the night of the murder. On September 26, 2005, a jury found Crockett guilty of felony murder and burglary. On October 24, 2005, Crockett was sentenced to an aggregate term of sixty years imprisonment. Crockett appealed but subsequently requested that the matter be remanded to the trial court pursuant to the *Davis-Hatton* procedure, which was granted by this court on July 19, 2006. On November 16, 2006, Crockett filed a petition for PCR, which was later amended by subsequent petitions on November 13, 2013, and March 18, 2014. The PCR court held evidentiary hearings in April of 2014 and issued an order denying relief on June 23, 2014. Additional facts will be provided as necessary.

# Discussion and Decision

## I. Direct Appeal Issues

### A. Trial Court's Admission and Exclusion of Evidence

[7] The admission or exclusion of evidence is a determination entrusted to the discretion of the trial court. *Kelley v. Watson*, 677 N.E.2d 1053,

1059 (Ind. App. 1997). We will reverse a trial court's decision only for an abuse of discretion, that is, only when the trial court's action is clearly erroneous and against the logic and effect of the facts and circumstances before the court. *Id.*

*Adkins v. State*, 703 N.E.2d 182, 186 (Ind. Ct. App. 1998).

[8] "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Ind. Evidence Rule 401. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Ind. Evidence Rule 403. "The trial court enjoys broad discretion in weighing the probative value of the evidence against the potential for prejudice." *Burks v. State*, 838 N.E.2d 510, 519 (Ind. Ct. App. 2005)

### 1. Witness Tattoos

[9] During the cross-examination of Moffitt, defense counsel attempted to elicit testimony that Moffitt had a tattoo indicating gang affiliation. The State objected on relevancy grounds. Crockett argued that both Moffitt and Avance have identical tattoos indicating affiliation with the same gang which supported Crockett's theory that the two had motive to formulate a false story in order to frame Crockett for the murder. The trial court found that the potential prejudicial effect outweighed the probative value of the evidence and consequently sustained the objection. Crockett now argues that the trial court abused its discretion in declining to permit his line of questioning on this issue.

As the trial court recognized, the evidence of a shared gang affiliation is only marginally relevant because it was cumulative. It was undisputed that Moffitt and Avance were closely associated as evidenced by the fact that they have a child together, that Moffitt drove a stolen car to Avance's home in South Bend, told her he was wanted for drug and gun charges, and asked her if she knew anyone who would be interested in helping him conduct a robbery. The subsequent allegation that the two were a part of the same gang provides only negligible additional evidence of their relationship. Furthermore, it is inherently prejudicial to introduce evidence of gang affiliation as it creates a presumption of bad character. We think there is ample evidence to conclude that the probative value of the tattoos is substantially outweighed by the danger of unfair prejudice and needless presentation of cumulative evidence. The trial court enjoys broad discretion in making Rule 403 determinations, *id.* at 519, and we cannot say that the trial court abused that discretion here.

## 2. Photo of Crockett

Crockett argues that the trial court erred in admitting State's Exhibit 59, a photo of Crockett taken from the video of his interview with Captain Hadary. The State sought to introduce this photo as a response to Crockett's claim that he had been shot in the face just prior to Wolfe's murder, was "laid up" as a result of the injury, tr. p. 977, and so could not have taken part in the crime. The State argues that the photo was relevant to show that Crockett had no signs of a facial wound at the time of the interview, which was conducted approximately a month after the crime. Crockett argued that the photo's relevance was

minimal because it is blurry and that it is prejudicial because Crockett appears unkempt and wearing jail garb. When considering whether to admit the photograph, the trial court viewed the photo and found that it "shows the absence of any facial wounds, and I think that actually is sufficiently clear." Tr. p. 761. The trial court also found that Crockett's appearance in the photo was not unlike his appearance in another photo already admitted and that his clothing was not "identifiable in anyway as prison garb." Tr. p. 764. Therefore, the probative value was significant as it disproved Crockett's claim of injury and was, at most, minimally prejudicial. Once again, the trial court has broad discretion in making Rule 403 determinations and we think the trial court was well within its discretion on this issue.

### 3. Defense Witness

"Trial courts have the discretion to exclude a belatedly disclosed witness when there is evidence of bad faith on the part of counsel or a showing of substantial prejudice to the State." *Williams v. State*, 714 N.E.2d 644, 651 (Ind. 1999). Several specific factors have been deemed helpful in determining whether to exclude witness testimony: (1) the point in time when the parties first knew of the witness; (2) the importance of the witness's testimony; (3) the prejudice resulting to the opposing party; (4) the appropriateness of instead granting a continuance or some other remedy; and (5) whether the opposing party would be unduly surprised and prejudiced by the inclusion of the witness's testimony. *Id*. at 651 n. 5; *Cook v. State*, 675 N.E.2d 687, 691 n. 3 (Ind. 1996).

*Rohr v. State*, 866 N.E.2d 242, 245 (Ind. 2007).

Crockett's trial began on Monday September 19, 2005. On September 16, 2005, the Friday prior to trial, Crockett advised the State of his intent to call twelve

witnesses, one of which was Ikelee Lottie, one of Moffitt's fellow inmates. On the first day of trial, the State moved to strike a number of the witnesses. Defense counsel argued that he was only made aware of the witnesses within the previous week and that two of the witnesses, Michael Townsend and Dwight Neal, were inmates who could discredit Moffitt's testimony by testifying that Moffitt was attempting to recruit other inmates to "jump on the case, that is, to become witnesses to help strengthen his own testimony in this case." Tr. p. 9. Defense counsel stated that the remaining witnesses were similar and would be called only to bolster Townsend or Neal's testimony if necessary. To avoid the exclusion of any of the witnesses, the trial court ordered defense counsel to make the witnesses available for the State to depose on the following afternoon. The State was able to interview nearly all of the witnesses. However, the State was unable to depose Lottie because the attorney sent by Crockett to oversee the deposition refused to participate in the interview of Lottie due to a conflict of interest. On the fourth day of trial, Crockett argued that Lottie should be allowed to testify despite not having been deposed. After being questioned by the trial court, Crockett indicated that he had been aware of Lottie's potential as a witness for over a year. The trial court applied the five *Rohr* factors and decided to exclude the witness. *Rohr*, 866 N.E.2d at 245.

[14] The first of the *Rohr* factors, and most relevant in this case, is the fact that Crockett had known of Lottie's potential as a witness for a year prior to trial and waited until the eve of trial to notify the State. Both parties argue that the

second factor, importance of the witness's testimony, weighs in their favor. Initially, Crockett advised the State, via his witness list, that Lottie would provide testimony similar to that of Townsend and Neal, thus making it cumulative and less important. However, midway through the trial, Crockett indicated that Lottie would now testify that Moffitt had revealed to Lottie his (Moffitt's) intent to perjure himself at trial. Although such testimony would be extremely important to Crockett, the timing and nature of its disclosure is dubious. The third and fifth factors, prejudice and undue surprise to the opposing party, both work in the State's favor. Crockett wished to call a witness who had not been made available for deposition, had been disclosed just days before trial, and was expected to testify that the State's key witness was perjuring himself. Even assuming the State could have facilitated a deposition of Lottie prior to his testimony, there would have been little if any time left to prepare a response. Finally, it seems that another remedy, such as a continuance, would have been difficult given the circumstances. The trial was already on its fourth day and the trial court noted that at least one of the jurors would suffer significant financial hardship if the trial extended longer than one week. Based on these considerations, we think the trial court was within its discretion to exclude the witness.

### 4. Captain Hadary's Testimony

[15] The following exchange occurred during the prosecutor's direct examination of Captain Hadary in which Captain Hadary describes his initial interview with Crockett:

Q: What did you tell [Crockett]?

A: Just that we had received a tip that he was involved, and we wanted to talk to him about the Mary Lou Wolfe case.

Q: Did you tell him any specifics about Mary Lou Wolfe?

A: No.

Q: Did you ask him about the case?

A: Yes.

Q: What was his response?

A: That he didn't have anything to do with that, didn't know where, was nowhere on Cleveland [Street], didn't know her, had nothing to do with it.

Q: Did he make any specific reference to Miss Wolfe herself?

A: Yes, he did.

Q: What was that?

A: He said he didn't kill that white b****.

[Defense counsel objects]

Tr. p. 771. Captain Hadary went on to testify that the Homicide Unit's standard procedure is to not release any information on a victim during a pending investigation. Captain Hadary also testified that, to his knowledge, the race of the victim was never disclosed in the newspaper or on TV, the implication being that Crockett knew that Wolfe was white because he was, in fact, her killer.

[16] Crockett claims that the trial court improperly admitted Captain Hadary's comment, arguing that the comment should have been excluded pursuant to Indiana Trial Rule 403 because it was both irrelevant and highly prejudicial. Crockett argues that because Captain Hadary could not say for certain that Wolfe's picture was never made available to the public, the implication from

the comment is irrelevant.[4]  However, the fact that Wolfe's picture could potentially have been made public only works to cast doubt on the implication, it does not prove the implication false.  In other words, it goes to the weight of the evidence, not its admissibility.

> [T]he fact that evidence only inconclusively connects the defendant to a crime affects the weight to be accorded that evidence by the fact-finder, rather than affecting its admissibility.  *Hunter v. State*, 578 N.E.2d 353, 357 (Ind. 1991), *reh'g denied*; *see also Johnson v. Indiana*, 272 Ind. 547, 400 N.E.2d 132, 133 (1980) ("That the connection with the crime is inconclusive affects the weight of the evidence but does not render it inadmissible.").

*Adkins v. State*, 703 N.E.2d 182, 186 (Ind. Ct. App. 1998).  It was for the jury to decide whether Crockett's knowledge of the victim's race implicated him in the crime or if he discovered her race through another means.  As such, the comment is relevant.

[17]  Furthermore, the probative value of the testimony was not substantially outweighed by any potential danger of unfair prejudice.  As the trial court noted in its decision to admit the testimony, "it may be highly prejudicial, but it's also highly probative.  And under Rule [] 403 … the preference is in favor of

---

[4] Crockett also briefly argues that his "white b****" statement was not referring to Wolfe but to another white female murder victim in an unrelated case.  The PCR court addressed this argument in its order as follows: "The [trial court] did not review the videotape [of Crockett's interview] during the trial…The videotape was introduced at the PCR hearing and has been reviewed.  The Court's review of the video reveals that the State was correct…despite Crockett-Berry's PCR claim [that he was referring to another woman], his initial 'white b[****]' comment was made directly in connection with a discussion of the Wolfe break-in and shooting.  After reviewing the tape, the Court finds that Sgt. Hadary neither 'lied on' the Petitioner nor misstated the interview."  Appellant's Br. 56.  Determining who Crockett's comment was referring to is a factual issue that the PCR court addressed.  This court does not reweigh evidence and will not do so here.  *Vitek v. State*, 750 N.E.2d 346, 352 (Ind. 2001).

admission ….” Tr. p. 778.  Although we are unconvinced that the statement is *highly* prejudicial, we nonetheless agree with the trail court's reasoning and conclude that is was not an abuse of discretion to admit the testimony.

# B. Prosecutorial Misconduct

[18]     In reviewing a claim of prosecutorial misconduct properly raised in the trial court, we determine (1) whether misconduct occurred, and if so, (2) whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected otherwise.  A prosecutor has the duty to present a persuasive final argument and thus placing a defendant in grave peril, by itself, is not misconduct.  Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct.  The gravity of peril is measured by the probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct.

*Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014) (citations and quotations omitted).

## *1. Captain Hadary's Testimony*

[19]     Crockett claims that the prosecutor committed prosecutorial misconduct by eliciting testimony from Captain Hadary that Crockett knew the victim's race. Crockett argues that the prosecutor's true goal in eliciting this testimony was to inject the issue of race into the proceedings in order to "gain a conviction on the basis of racial prejudice." Appellant's Br. p. 22.  As we have already determined, the trial court did not abuse its discretion in admitting the statement.  It would be illogical for us to hold that introducing evidence which is both highly prejudicial and highly probative amounts to misconduct.  This would run counter to the balancing scheme established by Rule 403.

Furthermore, the alleged prejudicial statement did not place Crockett in a position of grave peril and/or have had any persuasive effect on the jury. Crockett argues that the prosecutor elicited the statement "for purposes of obtaining an advantage by pointing out to the jury that this was a crime committed by a black man against a white woman." Appellant's Br. p. 20. However, the jurors had already been shown crime scene and autopsy photos which showed that the victim was white. As such, the statement introduced no new information about race which could have put Crockett in grave peril or had any significant persuasive effect on the jury.

## 2. Suborning Perjury

A conviction must be set aside where there is a reasonable likelihood that testimony known to be false could have affected the judgment of the jury. *Gordy v. State*, 270 Ind. 379, 381, 385 N.E.2d 1145, 1146 (1979). "Further, Indiana has recognized a prosecutorial duty of voluntary disclosure of actual 'deals' made with state's witnesses, such as promises, grants of immunity, and rewards offered in return for testimony." *Id*.

The State's letter offering Moffitt immunity reads as follows:

> We have no interest in, and will not contemplate the filing of any formal charges against you on any drug related matters, murder in any degree or false informing charges, which may be part of this homicide investigation.
>
> Assuming that you cooperate freely in the homicide investigation, are <u>completely</u> truthful about your knowledge of the events, are willing to testify at any subsequent trial, and, of course, are not the person who

> shot Mary Lou Wolfe, we will forego prosecuting your participation in this event.

State's Ex. 43 (emphasis in orginal). In his initial post-immunity statement, Moffitt implicated Crockett in the crime but neglected to mention Phillips or Avance. Investigator Decker testified that it is common for witnesses to initially omit relevant information and that it often takes multiple interviews to obtain all of the available information. In a subsequent interview, Moffitt revealed Phillips's and Avance's involvement in the crime. On cross-examination, Moffitt stated that he initially neglected to mention Phillips and Avance because he "didn't want to implicate anyone else who had nothing to do with, you know, the murder." Tr. p. 559.

[23] Crockett claims that the State's "unconditional promise not to prosecute Moffitt for perjury," appellant's br. p. 27, together with the State's failure to revoke Moffitt's immunity after realizing that he had omitted information in his initial statement "created an unconditional promise to Moffitt that he could lie to investigators and on the witness stand without fear of prosecution for false informing charges." Appellant's Br. p. 26. Crockett's argument is without merit. As evidenced by the immunity letter, the State made no promise not to prosecute Moffitt for perjury and conditioned the immunity on the understanding that Moffitt be completely truthful. Furthermore, the State was under no obligation to revoke the immunity based on an omission which was ultimately remedied before trial. Finally, Crockett failed to provide any sound evidence that Moffitt's testimony was false. The prosecutor cannot be guilty of suborning perjury when there is no evidence that the testimony was perjured.

# II. PCR Issues

## A. *Brady* Violations

In *Brady v. Maryland*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). "To establish a *Brady* violation, a defendant must show '(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial.'" *Stephenson v. State*, 864 N.E.2d 1022, 1056-57 (Ind. 2007) (quoting *Conner v. State*, 711 N.E.2d 1238, 1245-46 (Ind. 1999)). Under *Brady*, evidence is material if "'the defendant ... establish[es] a reasonable probability that the result of the proceeding would be different if the State had disclosed [the] evidence.'" *Id.* (quoting *Azania v. State*, 730 N.E.2d 646, 655 (Ind. 2000)).

### 1. Moffitt Testimony

[24] Our supreme court has acknowledged the importance of fully disclosing to the jury any beneficial agreement between an accomplice and the State, even when those agreements are not reduced to writing. [*McCorker v. State*, 797 N.E.2d 257, 266 (Ind. 2003)].

* * *

[O]ur supreme court has also held that the duty to disclose arises when there is a confirmed promise of leniency in exchange for testimony and that preliminary discussions are not matters which are subject to mandatory disclosure. *Sigler v. State*, 700 N.E.2d 809, 812 (Ind. Ct. App. 1998), *trans. denied* (1999); [*Wright v. State*, 690 N.E.2d 1098, 1113 (Ind. 1997)]. An express agreement requiring disclosure does not exist if a witness testifies favorably in the hope of leniency, and the

> State neither confirms nor denies leniency to the witness. *Sigler*, 700
> N.E.2d at 812; *Wright*, 690 N.E.2d at 1113.

*Seketa v. State*, 817 N.E.2d 690, 693-694 (Ind. Ct. App. 2004).

[25] Several months after Crockett's conviction, the State filed a motion to modify Moffitt's sentence. Crockett alleges that the prosecutor had an agreement to modify Moffitt's sentence in exchange for his testimony and that the agreement was not disclosed to Crockett. Crockett argues that failure to disclose such an agreement amounts to prosecutorial misconduct and a *Brady* violation. At the PCR hearing, the deputy prosecuting attorney testified that there had been no such agreement to modify Moffitt's sentence in exchange for his testimony. Despite evidence offered at the PCR hearing which suggested that Moffitt's sentence modification was somewhat atypical, the PCR court determined that there was no agreement between the State and Moffitt pertaining to a sentence reduction. As such, Crockett's arguments on appeal suggesting that an agreement did exist are nothing more than invitations to reweigh the evidence which we will not do. *Vitek*, 750 N.E.2d at 352.

[26] We note that Moffitt may have expected a sentence reduction following his testimony. However, without an explicit agreement, the unilateral expectation of sentence relief does not warrant reversal on *Brady* grounds. *Lambert v. State*, 743 N.E.2d 719, 749 (Ind. 2001). Because Crockett failed to establish the existence of an agreement, there are no grounds to find prosecutorial misconduct or a *Brady* violation as there is no favorable evidence that could have been withheld from Crockett.

## 2. Van Winkel Murder

[27]     Crockett claims that the State committed a *Brady* violation by failing to turn over information which tied Moffitt to an unrelated South Bend burglary which resulted in the murder of Lori Van Winkel. On February 25, 2002, during the investigation into the Van Winkel murder, Captain Hadary interviewed Kinte Johnson who indicated that Moffitt and another individual had targeted Van Winkel because they believed she was associated with a drug dealer. The burglary of Van Winkel, who seemingly was not involved in drug dealing, went awry and resulted in her being shot. According to Johnson, Moffitt later made reference to "two wrong addresses in one month," and also told him details about Wolfe's murder. PCR Petitioner's Ex. 16. Crockett claims the State was obligated to send him the police reports and video tapes of the interview and that this information was beneficial because it tied Moffitt to a similar crime and would further discredit his testimony.

[28]     Crockett's argument fails for several reasons. Firstly, the State provided Crockett with a narrative of the interview with Johnson on September 9, 2004, more than a year before trial. This report focuses on the information Johnson gave regarding Wolfe's murder and references that Moffitt was involved in another burglary at an incorrect address that resulted in a murder. This report gave Crockett notice that Johnson had information on Moffitt relating to Crockett's case. "[T]he State will not be found to have suppressed material information if that information was available to a defendant through the exercise of reasonable diligence." *Conner v. State*, 711 N.E.2d 1238, 1246 (Ind.

1999) (citing *United States v. Morris*, 80 F.3d 1151, 1170 (7th Cir. 1996)). The report also noted that there was a videotape of the interview with Johnson which Crockett could have requested from the State.

Crockett's argument also fails because he has not shown that Johnson's interview was favorable to his defense. Although the interview may have generally discredited Moffitt's testimony by tying him to a similar crime, Johnson also stated that Moffitt told him it was Crockett who shot and killed Wolfe, thus corroborating Moffitt's testimony. Finally, we note that one of Crockett's witnesses, Steven Spears, was convicted of killing Van Winkel prior to his testimony in this case. Therefore, had there been any significantly helpful information in relation to the Van Winkel murder, it could have been gathered from Spears. Accordingly, we find that Crockett has failed to establish that the State suppressed evidence or that the allegedly suppressed evidence was favorable to his defense.

## II. Ineffective Assistance of Trial Counsel

This Court reviews claims of ineffective assistance of counsel under the two components set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel's representation fell below an objective standard of reasonableness, and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defendant. To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Wentz v. State*, 766 N.E.2d 351, 360 (Ind. 2002) (citations omitted).

[31] Crockett claims that his trial counsel, Charles Lahey, was ineffective for failing to file a motion in limine to prevent the State from eliciting testimony from Captain Hadary regarding Crockett's statement, "I didn't kill that white b****." Tr. p. 771. Crockett also claims that Lahey was ineffective for failing to find news coverage which revealed Wolfe's race in order to rebut the implication made by Captain Hadary's testimony. The following exchange occurred during Lahey's cross-examination of Captain Hadary:

> Q: Nice job of planting the race issue in this case, Sergeant Hadary?
>
> State: I would object to that, Your Honor. All blood is red.
>
> Court: That's not a question, and I'm going to – Please, Mr. Lahey, limit yourself to questions, not statements.
>
> Q: You watched all three channels the day after this murder?
>
> A: No, I can't say that I did.
>
> Q: You watched all three channels the next day after that?
>
> A: No.
>
> Q: And yet you confidently say that it was not on TV, the race of the woman?
>
> A: Yes.
>
> Q: And yet you got no idea. You didn't watch all of the channels. You didn't watch all of the news coverage, and yet you say, it wasn't covered by TV. It's pretty irresponsible to make that kind of statement; isn't it?
>
> A: In all of the homicides that I've been involved with back there, I can't ever say that -- [] that I have ever saw her picture ever.

Q: Well, you may not have seen her picture. Does that mean it's never been shown?

A: It's possible.

Q: You've never seen a news commentator mention on TV that she was a white woman. Does that mean it never happened?

A: It's possible.

\* \* \*

Q: Did you read the obituary column?

A: I can't say that I did.

Q: It's pretty customary for a person's picture to be in an obituary column; is it not?

A: Sometimes, yes.

Q: And you're telling me that you never released a photograph of Mrs. Wolfe, so there's no way that anybody would know that she was white, right?

A: Right.

Q: And yet, if her photograph appeared in the obituary column, there would be a picture of her in all of her whiteness sitting there in the back of the South Bend Tribune.

A: If it was in there, yes.

Q: Okay. And you didn't bother to check. You just made this statement that nobody knew that she was a white woman on your own, right? You said her picture never appeared in the South Bend Tribune, right?

A: Right. I can't say that I remember. That's four years ago, and a lot of cases that – I could say, I never recalled seeing her picture, and every newspaper article on this whole case would be in that book, in the homicide book.

Q: Not every. Do you have transcripts of every television mention of it?

A: No, not transcripts…

Tr. pp. 786-789. Lahey asked several more questions designed to cast doubt on the implication that Crockett would only have known Wolfe's race if he was in fact her killer.

[32] During the PCR hearing, Lahey testified that he believed he had made an informal agreement with the prosecutor that the statement would not be introduced at trial. Lahey claimed that the agreement was violated and that had he known the State was planning on introducing the statement, he would have filed a motion in limine. If such a motion was denied, he would have looked for news coverage which revealed Wolfe's race.

[33] Although Lahey admitted that he would have done things differently in retrospect, we do not think his actions fell below an objective standard of reasonableness for many reasons. The trial court allowed the testimony despite Lahey's vehement Rule 403 objection. Therefore, it is unlikely that a motion in limine would have been successful. Moreover, Crockett produced no definitive evidence in his PCR petition that there was any news coverage prior to Crockett's statement which showed Wolfe's race, *i.e.* Lahey could not be ineffective for failing to find evidence which did not exist. Finally, we think that Lahey's thorough cross-examination of Captain Hadary provided a satisfactory rebuttal of the implication created by Hadary's testimony. By the time Lahey's cross-examination was complete, it was clear that Captain Hadary could not rule out the possibility that Crockett discovered the victim's race via news coverage. "Isolated poor strategy, bad tactics, a mistake, carelessness or inexperience do not necessarily amount to ineffective counsel unless, taken as a

whole, the defense was inadequate." *Davis v. State*, 675 N.E.2d 1097, 1100 (Ind. 1996) (quoting *Terry v. State*, 465 N.E.2d 1085, 1089 (Ind. 1984)). Taken as a whole, Lahey's representation was more than sufficient and his failure to file a motion in limine was, at worst, an isolated mistake.

[34] Furthermore, as we outlined in Section I-B-1, we do not think that Captain Hadary's testimony regarding Crockett's statement had any persuasive effect on the jury. Similarly, we do not think that there is a reasonable probability that, but for Lahey's alleged errors, the result of the proceeding would have been different.

[35] The judgments of the trial and PCR courts are affirmed.

Najam, J., and Mathias, J., concur.