

**FILED**

Mar 04 2015, 7:51 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Victoria L. Bailey
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Cynthia L. Ploughe
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

David Bisard,

*Appellant-Defendant,*

v.

State of Indiana

*Appellee-Plaintiff*

March 4, 2015

Court of Appeals Case No.
02A03-1312-CR-492

Appeal from the Allen County
Superior Court
Cause No. 02D06-1302-FB-32
Honorable John Surbeck, Judge

**Friedlander, Judge.**

[1] Following a jury trial, David Bisard was convicted of Operating a Vehicle with a Blood Alcohol Content of .15 or Higher Causing Death, a class B felony,[1] and two counts of Operating a Vehicle with a Blood Alcohol Content of More Than

---

[1] Ind. Code Ann. § 9-30-5-5 (West, Westlaw 2010). Effective July 1, 2014, this offense has been reclassified as a Level 4 felony. I.C. § 9-30-5-5 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly). Because Bisard committed this offense prior to that date, it retains its prior classification as a class B felony.

.08 Percent Causing Serious Bodily Injury, class D felonies.[2]  Bisard was subsequently sentenced to an aggregate term of sixteen years executed with three years suspended to probation.  On appeal, Bisard presents three issues for our review:

1. Was Bisard denied his right to present a defense when the trial court ruled that if Bisard presented evidence from several witnesses that he was not a heavy drinker in response to expert testimony offered by the State, he would open the door to evidence of his subsequent arrest for operating a vehicle while intoxicated?

2. Did the trial court abuse its discretion in denying Bisard's motion for mistrial based upon issues relating to juror misconduct?

3. Did the trial court abuse its discretion when for purposes of sentencing it considered as an aggravating factor that Bisard had abused police power and breached the public trust?

We affirm.

On August 6, 2010, David Bisard, then an officer with the Indianapolis Metropolitan Police Department (IMPD), responded to a radio run to assist other IMPD officers who were pursuing a subject with an outstanding arrest warrant in the area of 42nd Street and Priscilla.  Bisard was in uniform and driving his marked vehicle.  While en route Bisard activated his emergency lights and siren.  Bisard was traveling westbound on East 56th Street "weaving in and out of traffic" and travelling approximately seventy-four to seventy-five

---

[2] I.C. § 9-30-5-4 (West, Westlaw 2010).  Effective July 1, 2014, this offense has been reclassified as a Level 6 felony.  Ind. Code Ann. § 9-30-5-4 (West, Westlaw current with all 2014 Public Laws of the 2014 Second Regular Session and Second Regular Technical Session of the 118th General Assembly).  Because Bisard committed these offenses prior to that date, they retain their prior classification as class D felonies.

miles per hour. *Transcript* at 680. Near the intersection of East 56th Street and Brendan Way South Drive, Bisard's vehicle collided with two motorcycles stopped in the drive-through lane at that intersection. Eric Wells died as a result of the injuries sustained in the accident. Mary Mills and Kurt Weekly were both seriously injured. Shortly after impact, Bisard informed the IMPD control operator that he had been involved in an accident and requested that medics be rushed to the scene.

[3] Several members of IMPD, including members of the IMPD command staff, fire personnel from various agencies, and medical personnel (collectively, First Responders) were immediately dispatched to the scene. Several First Responders had close, face-to-face interaction with Bisard while treating him for minor injuries he received as a result of the accident. Those who interacted with Bisard at the scene testified that Bisard did not exhibit any signs of intoxication, such as bloodshot eyes, unsteady balance, or slurred speech. Several others testified that there was no indication that Bisard was intoxicated.

[4] Bisard was eventually taken to Methodist Occupational Health Center for further treatment of his injuries. There, as a matter of standard procedure, Bisard was advised of Indiana's implied consent law, and he consented to a blood draw. The blood results showed that Bisard's blood-alcohol content was 0.19.

[5]     On January 12, 2011,[3] the State charged Bisard with Count I, class B felony operating a motor vehicle with a blood alcohol-content of .15 or higher causing the death of Eric Wells; Count II, class C felony operating a vehicle while intoxicated causing the death of Eric Wells; Count III, class C felony reckless homicide; Count IV, class D felony operating a motor vehicle while intoxicated causing serious bodily injury to Kurt Weekly; Count V, class D felony operating a motor vehicle with a blood-alcohol content of .08 or higher causing serious bodily injury to Kurt Weekly; Count VI, class D felony operating a motor vehicle while intoxicated causing serious bodily injury to Mary Mills; and Count VII, class D felony operating a motor vehicle with a blood-alcohol content of .08 or higher causing serious bodily injury to Mary Mills. Two additional charges of criminal recklessness, Counts VIII and IX, were subsequently added.

[6]     On February 4, 2011, Bisard filed a motion to suppress blood evidence and/or dismiss the charges, and the court subsequently held a hearing thereon. On May 31, 2011, the trial court ruled that the blood evidence would be suppressed as to the Title 9 charges for OWI but allowed that evidence for the charge of reckless homicide. Upon requests by both parties, the trial court certified its order for interlocutory appeal, and this court accepted jurisdiction. This court reversed the trial court, finding that the blood evidence was admissible with

---

[3] The State originally charged Bisard on August 11, 2010 under Cause No. 49G05-1008-FB-62502, with offenses arising from the vehicular crash that occurred on August 6, 2010. The State moved to dismiss the charges, citing "Evidentiary Problems", on August 20, 2010. *Appellant's Appendix* at 159. The State refiled the charges on January 12, 2011 under Cause No. 49G05-1101-FB-2516.

respect to all charges. *See Bisard v. State*, 973 N.E.2d 1229 (Ind. Ct. App. 2012), *trans. denied*.

[7] On February 14, 2013, the trial court granted Bisard's request for change of venue. The Allen County Superior Court accepted jurisdiction on February 19, 2013. A jury trial commenced on October 14, 2013.

[8] On the morning of closing arguments, November 4, 2013, the trial court informed the parties of "a potential jury issue." *Transcript* at 3901. Juror 8-2 was then brought into the courtroom. In response to questioning by the trial court, Juror 8-2 admitted that despite repeated instructions to refrain from conducting independent research about the case, he did in fact conduct an internet search concerning the instruments used to analyze blood samples for alcohol. Juror 8-2 stated that he wondered whether it was possible for anyone "to beat a blood alcohol test." *Id.* at 3905. Juror 8-2 informed the court that his research revealed that some 500 blood-alcohol tests had been overturned in another state, and that he had shared this information with other jurors. Juror 8-2 was removed from the jury and escorted from the building.

[9] The trial court then brought in each of the remaining jurors individually and asked them if they were aware of Juror 8-2's research. Some of the jurors knew nothing of Juror 8-2's internet research. Other jurors told the court they knew something of Juror 8-2's research and that they were somewhat aware that the research concerned the blood analysis equipment and the reversal of other convictions in another state. All of the jurors who indicated that they knew

anything about Juror 8-2's conduct readily assured the trial court of their ability to set aside what they had heard and base their decision solely upon the evidence presented in the courtroom. After completing its questioning of the remaining jurors, the trial court recessed the proceedings. When the trial reconvened, the parties gave their closing arguments and the case was given to the jury.

[10] After the jury retired to begin its deliberations, the court sought to make a record of the discussion in court chambers regarding the decision to dismiss Juror 8-2 and replace that juror with the alternate. In response, Bisard sought to make a record that during that discussion in chambers he had requested a mistrial based upon juror misconduct. The prosecutor replied that she did not recall a motion for mistrial being made by Bisard. The court explained that it did not recall any "serious motion for mistrial" or any "vigorous objection" to proceeding with the case. *Id*. at 4044. The court further stated that in light of its colloquy with the jurors, the court was "perfectly comfortable" with letting the case proceed to the jury, thereby indicating that it believed the remaining jurors had not been tainted by Juror 8-2's conduct. *Id*.

[11] On November 5, 2013, the jury returned its verdicts, finding Bisard guilty on all counts. At a sentencing hearing on November 26, 2013, the trial court entered judgment of conviction on Count I, class B felony operating a motor vehicle with a blood alcohol-content of .15 or higher causing the death of Eric Wells, Count V, class D felony operating a motor vehicle with a blood-alcohol content of .08 or higher causing serious bodily injury to Kurt Weekly, and Count VII,

class D felony operating a motor vehicle with a blood-alcohol content of .08 or higher causing serious bodily injury to Mary Mills.[4] The trial court then sentenced Bisard to thirteen years, with ten years executed in the Department of Correction on Count I and one and one-half years each for Counts V and VII. The court ordered the sentences served consecutively for an aggregate sentence of sixteen years with three years suspended.

[12] In explaining the sentence imposed, the trial court discussed its findings as to mitigating and aggravating circumstances. With regard to the aggravating factors, the trial court noted that Bisard's conduct "resulted in injuries greater than the elements necessary to prove the commission of the offenses" and that he was in need of rehabilitative treatment that could only be provided by a penal facility. *Sentencing Transcript* at 140. The trial court further found as aggravating that Bisard abused his police power and breached the public trust. Specifically, the court stated:

> The Defendant was in fact a commissioned police officer bound to uphold and enforce the laws of the State. What came to mind as I worked on, considered and finally drafted this statement was what we constantly hear is that police officers are there to protect and serve and certainly on August the 6th, 2010, the Defendants [sic] conduct did not protect or serve the public or these particular three victims. The Defendant was on duty while significantly intoxicated. At .19 blood alcohol content.

---

[4] The trial court determined that the remaining counts merged with these convictions.

*Id.* at 140-141.[5]  The court continued, noting that "[t]he Defendant unnecessarily responded to a non-emergency call at a high rate of speed, disregarding department rules and general orders regarding approach to intersections resulting in the death and injury of law abiding and unsuspecting citizens." *Id.* at 141.

1.

[13]  Bisard argues that he was denied his due process right to present a defense when the trial court ruled that Bisard could not present the testimony of numerous witnesses who would testify as to his drinking or non-drinking habits without opening the door to evidence of his subsequent OWI arrest.[6]

[14]  Every defendant has the fundamental right to present witnesses in his or her own defense.  *Barber v. State*, 911 N.E.2d 641 (Ind. Ct. App. 2009) (citing *Roach v. State*, 695 N.E.2d 934) (Ind. 1998)); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense.").  "This right 'is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecutor's to the jury so it may decide where the truth lies.'" *Barber v. State*, 911 N.E.2d at 646 (quoting *Roach v. State*, 695 N.E.2d at 939).

---

[5] The trial court explained that based on the evidence presented at trial, it found the blood tests showing a Bisard's blood-alcohol content was .19 to be accurate.

[6] Bisard's 2013 OWI arrest was the subject of several pre-trial motions.  The trial court ruled at that time that evidence of Bisard's subsequent OWI arrest would not be admissible at trial.

"'At the same time, while the right to present witnesses is of the utmost importance, it is not absolute.'" *Id*. (quoting *Roach v. State*, 695 N.E.2d at 939).

[15]    During the State's case-in-chief, numerous witnesses, on questioning by both the State and the defense, revealed that Bisard exhibited no signs of intoxication immediately following the accident. The State thereafter called Dr. Alan Jones to testify about the accuracy of blood-alcohol tests and to describe in general terms[7] the effects of alcohol on the human body and various signs of impairment. With regard to the latter, Dr. Jones testified as to what it means to be a tolerant drinker, describing a tolerant drinker as an individual who is a heavy drinker and drinks alcohol over long periods of time such that they may exhibit less pronounced signs of intoxication. Dr. Jones explained that this is so because the receptors in the human brain adapt and become less sensitive and that such influences the signs and symptoms of intoxication that a person may exhibit. In short, Dr. Jones opined that it would be possible for a tolerant drinker to be intoxicated, but show no signs of intoxication.

[16]    In response to Dr. Jones's testimony, Bisard sought to present testimony from several witnesses[8] that he was not a heavy drinker to refute the implication that he was the sort of tolerant drinker described by Dr. Jones. Bisard argued that the State elicited testimony from Dr. Jones that was "not just on generalities of

---

[7] Dr. Jones's testimony was the subject of a motion in limine prior to trial in which it was agreed that his testimony would address the notion of the tolerant drinker in general terms and not directly reference Bisard.

[8] Bisard made an offer of proof as to the evidence he would present to rebut the notion that he was a tolerant drinker. Specifically, Bisard identified thirteen witnesses, each of whom he had worked with or socialized with, who would have testified that they had never witnessed Bisard consume large amounts of alcohol on a regular basis or utilize alcohol to excess.

tolerance" but rather, through examples, a specific reference to Bisard. *Transcript* at 2714. The prosecutor disagreed with Bisard's characterization of Dr. Jones's testimony being specific to Bisard. The trial court agreed with the State, finding that there was nothing in Dr. Jones's testimony that "pointed fingers at Mr. Bisard." *Id.* at 2716. The trial court informed Bisard that if he called witnesses to testify that he was not a heavy drinker and to vouch for his drinking or non-drinking habits, such would open the door for the State to present evidence of his 2013 OWI arrest.[9]

[17] We begin by noting that the trial court merely foreshadowed what its ruling regarding the admissibility of his 2013 OWI arrest would be if in fact Bisard chose to present witnesses to testify as to his drinking habits. It remains, however, that Bisard did not put forth his proposed witnesses, and the State did not offer evidence of his prior OWI arrest. The trial court, therefore, was never asked to make a ruling. We find that these circumstances are akin to a motion in limine. As a general rule, motions in limine do not preserve errors for appeal. *Shoultz v. State*, 995 N.E.2d 647 (Ind. Ct. App. 2013), *trans. denied*. Thus, in this sense, the threat of opening the door to admission of the 2013 OWI arrest did not preserve the issue for appellate review and certainly did not amount to a denial of due process.

[18] Bisard nevertheless maintains that the trial court's threatened ruling that evidence of his subsequent arrest would be admissible presented him with a

---

[9] The trial court did not rule that the evidence Bisard sought to present was inadmissible.

"Hobson's choice." This court has defined a "Hobson's choice" as being "an apparently free choice that is really no choice at all." *See Gray v. State*, 841 N.E.2d 1210, 1218 (Ind. Ct. App. 2006), *trans. denied*. We disagree.

[19] Defendants often must make hard evidentiary choices. Here, Bisard's choice may have been difficult, but it remains that he had a choice to make. Bisard could have chosen to present witness testimony that they had never seen him intoxicated or consume alcohol to excess, and when the State presented evidence of his subsequent OWI arrest, as the prosecutor indicated she would, Bisard could have challenged the admission of that evidence contemporaneously therewith. Bisard then could have made an argument on appeal that admission of his subsequent OWI was in violation of Ind. Trial Rule 404(b) both as to relevance and as being unduly prejudicial. Bisard could have also chosen, as he did here, to let the record stand, i.e., with testimony from numerous witnesses who observed no outward signs of intoxication from Bisard shortly after the accident and witnesses who told of the blood analysis revealing a remarkably high blood alcohol concentration level. Difficult evidentiary and strategic decisions do not in and of themselves violate a defendant's due process right to present a defense.

2.

[20]	Bisard argues that the trial court abused its discretion in denying his motion for a mistrial due to juror misconduct.[10] "A mistrial is an extreme remedy warranted only when no other curative measure will rectify the situation." *Burks v. State*, 838 N.E.2d 510, 519 (Ind. Ct. App. 2005 (quoting *Harris v. State*, 824 N.E.2d 432, 439 (Ind. Ct. App. 2005)), *trans. denied*. In order to prevail on appeal from the denial of a motion for mistrial, a defendant must establish that the questioned information or event was so prejudicial and inflammatory that he or she was placed in a position of grave peril to which he or she should not have been subjected. *Burks v. State*, 838 N.E.2d 510. "The gravity of the peril is determined by the probable and persuasive effect on the jury's decision." *Id*. at 519 (quoting *Mote v. State*, 775 N.E.2d 687, 689 (Ind. Ct. App. 2002), *trans. denied*). Since the trial court is in the best position to gauge the circumstances and probable impact upon the jury, a trial court's decision whether to grant a mistrial is afforded great deference. *Burks v. State*, 838 N.E.2d 510. Therefore, we will review the trial court's ruling on a motion for a mistrial only for an abuse of discretion. *Shriner v. State*, 829 N.E.2d 612 (Ind. Ct. App. 2005).

---

[10] We note that the record is not entirely clear as to whether Bisard actually made a motion for mistrial. As noted above, after the trial court conducted its inquiry of each of the jurors, the court and the parties adjourned to chambers where the issue of how to proceed was discussed without being recorded. After final instructions were given, final arguments were made, and the jury had begun its deliberations, Bisard asked that the record reflect that he had moved for a mistrial in chambers. The prosecutor asserted that she did not recall a motion for mistrial being made. The trial court noted for the record that it did not recollect that a "serious motion for mistrial" was made by Bisard or that Bisard had "any vigorous objection" to proceeding with the case during the discussion that took place in chambers. *Transcript* at 4044.

Bisard's motion for mistrial was based upon juror misconduct. In *Ramirez v. State*, 7 N.E.3d 933 (Ind. 2014), our Supreme Court restated the procedure trial courts are to follow in handling instances of juror misconduct.

> Defendants seeking a mistrial for suspected jury taint are entitled to the presumption of prejudice only after making two showings, by a preponderance of the evidence: (1) extra-judicial contact or communications between jurors and unauthorized persons occurred, and (2) the contact or communications pertained to the matter before the jury. *Currin* [*v. State*]*,* 497 N.E.2d [1045, 1046 (Ind. 1986)]. The burden then shifts to the State to rebut this presumption of prejudice by showing that any contact or communications were harmless. *See Myers v. State,* 240 Ind. 641, 646, 168 N.E.2d 220, 223 (1960); *Oldham v. State,* 249 Ind. 301, 305, 231 N.E.2d 791, 793 (1967). If the State does not rebut the presumption, the trial court must grant a new trial. On the other hand, if a defendant fails to make the initial two-part showing, the presumption does not apply. Instead, the trial court must apply the probable harm standard for juror misconduct, granting a new trial only if the misconduct is "gross and probably harmed" the defendant. *Henri v. Curto,* 908 N.E.2d 196, 202 (Ind. 2009) (internal quotation marks omitted). But in egregious cases where juror conduct fundamentally compromises the appearance of juror neutrality, trial courts should skip *Currin's* two-part inquiry, find irrebuttable prejudice, and immediately declare a mistrial. At all times, trial courts have discretion to decide whether a defendant has satisfied the initial two-part showing necessary to obtain the presumption of prejudice or a finding of irrebuttable prejudice.

*Id*. at 939 (some internal citations omitted).

Further, trial courts must immediately investigate suspected jury taint by thoroughly interviewing jurors collectively and individually, if necessary. *Ramirez v. State*, 7 N.E.2d 933. If any of the jurors have been exposed, that juror must be individually interrogated by the court outside the presence of the other jurors to determine the degree of exposure and the likely effect thereof.

*Id*. After each juror has been questioned, he should be individually admonished. *Id*. After all of the exposed jurors have been questioned and individually admonished, they jury should be assembled and collectively admonished. *Id*. If the imperiled party deems such action insufficient to remove the peril, that party should move for a mistrial. *Id*. The trial court is then tasked with applying the procedure set forth above. We rely upon trial courts to assess the situation and decide whether a mistrial is necessary under the circumstances. *Id*.

[23] Here, Juror 8-2 committed juror misconduct by performing an internet search on the reliability of blood tests. The State does not dispute the occurrence of the misconduct or question that it pertained to an issue before the jury. Pursuant to *Ramirez*, prejudice is therefore presumed and the burden shifted to the State to rebut this presumption of prejudice by showing that any contact or communications were harmless.

[24] As soon as the trial court learned of Juror 8-2's misconduct, the court brought Juror 8-2 into the courtroom and inquired into his actions. Juror 8-2 admitted to conducting independent research and informed the court of his findings. The trial court immediately removed Juror 8-2 from the jury and had him escorted from the building. The trial court then summoned the remaining jurors, one at a time, into the courtroom, where the trial court questioned each of them about what they knew of Juror 8-2's actions. Some of the jurors knew nothing of Juror 8-2's conduct. Those jurors who were somewhat aware of what Juror 8-2 had done assured the trial court that they could set aside anything they had

heard and decide the case based solely on the evidence they had heard or had seen in the courtroom.

[25] An unrecorded discussion between the court and the parties about how to handle Juror 8-2's misconduct was held in court chambers. After the case was given to the jury, a record was made as to the basis for the decision to proceed with the trial. Based on its questioning of the jurors, the jurors' assurances that they could decide the case on the evidence presented in the courtroom, in conjunction with its assessment of the jurors' demeanor, the trial court determined that it was "perfectly comfortable" with allowing the jury to begin deliberations. *Transcript* at 4044. Given the trial court's assessment that the dismissal of Juror 8-2 removed any taint on the jury, the State was not put in the position to have to present additional evidence demonstrating that Juror 8-2's conduct was harmless. The trial court is in the best position to gauge the surrounding circumstances of an event and its impact on the jury, we will not second-guess the trial court in this regard. Having reviewed the record, we conclude that the trial court's finding that a mistrial was not warranted was supported thereby.

[26] Contrary to Bisard's argument, we do not find that Juror 8-2's conduct falls in that category of cases where the misconduct is so egregious that it created an irrebuttable prejudice necessitating a mistrial. Juror 8-2's independent internet research into the reliability of blood tests is qualitatively different from the situation in *Kelley v. State*, 555 N.E.2d 140 (Ind. 1990),where during a recess in trial proceedings, jurors sat with a witness for the prosecution at lunch, and in

*Woods v. State*, 119 N.E.2d 558 (Ind. 1954), where police officers who were witnesses for the State, and the sheriff, who had been involved with solving the crime, visited with jurors in the room where the jury gathered during intermissions and recesses. *See also May v. State*, 716 N.E.2d 419 (Ind. 1999) (finding that trial court abused its discretion in refusing to remove a juror after it was revealed that the juror in question encountered one of the State's witnesses during a lunch break and invited the witness, whom the juror had known before the trial and had not seen in fifteen years, to the juror's home).

[27] Here, Juror 8-2 informed the court of the results of his internet search regarding the accuracy of blood-alcohol tests and that he had shared that information with some of the other jurors. Juror 8-2 was immediately relieved of his jury duties and escorted from the building. Those jurors who were aware of Juror 8-2's internet search clearly indicated that they could set aside what they heard from Juror 8-2 in arriving at their verdicts. As noted above, the trial court appropriately determined that the dismissal of Juror 8-2 removed any taint.

3.

[28] Bisard argues that the trial court abused its discretion when for purposes of sentencing it considered as an aggravating factor that Bisard had abused police power and breached the public trust.

[29] Sentencing decisions rest within the sound discretion of the trial court. *Anglemyer v. State*, 868 N.E.2d 482 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d 218 (Ind. 2007). So long as the sentence is within the statutory range, it is subject to

review only for an abuse of discretion. *Id.* An abuse of discretion will be found where the decision is clearly against the logic and effect of the facts and circumstances before the court or the reasonable, probable, and actual deductions to be drawn therefrom. *Id.* A trial court may abuse its discretion in a number of ways, including: (1) failing to enter a sentencing statement at all; (2) entering a sentencing statement that includes aggravating and mitigating factors that are unsupported by the record; (3) entering a sentencing statement that omits reasons that are clearly supported by the record; or (4) entering a sentencing statement that includes reasons that are improper as a matter of law. *Id.* Because the trial court no longer has an obligation to weigh aggravating and mitigating factors against each other when imposing a sentence, a trial court cannot now be said to have abused its discretion in failing to properly weigh such factors. *Id.*

[30] In challenging the trial court's finding that Bisard abused his police power and breached the public trust, Bisard essentially claims that such finding is not supported by the record. Bisard also seems to suggest that the trial court's finding is not a proper finding given the circumstances of this case.

[31] We recognize that the violation of a position of trust factor is commonly cited in other situations, namely where an adult commits an offense against a minor. Moreover, because most law enforcement officers abide by the law, it is infrequent that a trial court would have to cite violation of public trust as an aggravating factor, thus resulting in few cases citing such factor in this context.

Nevertheless, such reliance on violation of the public trust is not completely unknown.

[32] In *Powell v. State*, 769 N.E.2d 1128 (Ind. 2002), *abrogated on other grounds by Beattie v. State*, 924 N.E.2d 643 (Ind. 2010), the defendant was a police officer who was convicted of murdering a suspected drug dealer. During the commission of the offense, the defendant was wearing his police uniform and acted under the pretense that he was investigating drug activity. In sentencing the defendant, the trial court cited as part of the nature and circumstances of the crime defendant's abuse of police power and breach of public trust. The Supreme Court noted the trial court's finding in this regard, in addition to other circumstances, in affirming the sentence imposed by the trial court. *See also Collins v. State*, 643 N.E.2d 375 (Ind. Ct. App. 1994) (relying upon fact that defendant who molested his daughter was a former police officer and was trained in the law as an aggravating circumstance).

[33] Here, the trial court noted that Bisard was "a commissioned police officer bound to uphold and enforce the laws of the State" and that as a police officer he was bound to protect and serve. *Sentencing Transcript* at 140. The court further noted that on the day of the accident, Bisard, with a blood-alcohol content of .19, "unnecessarily responded to a non-emergency call at a high rate of speed, disregarding department rules and general orders regarding approach to intersections resulting in the death and injury of law abiding and unsuspecting citizens." *Id*. at 141. The trial court's explanation demonstrates its finding of a violation of the public trust was supported by the record.

[34]     We further agree with the comments put forth by the State in its appellate brief. The State aptly noted the "unique role of police officers in society and the necessity that the community trust officers to do their job appropriately." *Appellee's Brief* at 23. Further, "[s]ociety has a right to expect that law enforcement officers, who are hired to protect and to serve the community, will perform the tasks necessary for that role while they are sober and taking care to create no undue harm to society." *Id*. As appropriately noted by the trial court, Bisard violated this public trust. The trial court did not abuse its discretion in relying upon this factor as a significant aggravating circumstance.

[35]     Judgment affirmed.


         Kirsch, J., and Crone, J., concur.