## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 06 2019, 9:31 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Deborah Markisohn
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Kevin Jones,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

May 6, 2019

Court of Appeals Case No.
18A-CR-1320

Appeal from the Marion Superior Court

The Honorable Kurt Eisgruber, Judge

Trial Court Cause No.
49G01-1609-F3-36200

**Robb, Judge.**

# Case Summary and Issue

[1] Following an incident with his girlfriend, Kevin Jones was charged with multiple counts of battery and kidnapping. After a jury was selected and sworn, but before the trial began, the trial court recessed for a lunch break. As Juror 11 returned from break, he was approached by a member of Jones' family who whispered something about self-defense. Juror 11 told the bailiff, who informed the court and counsel about the contact. Juror 11 also told the other jurors that he was probably going to be removed as a juror because someone said something to him but he assured the other jurors "[i]t wasn't anything bad[.]" The trial court and counsel questioned Juror 11 about the communication and ultimately dismissed him. The trial court and counsel also questioned each remaining juror individually about what they had heard from Juror 11 and what impact it had on their ability to remain on the jury. After questioning, the State orally moved for a mistrial and defense counsel joined, but the trial court denied the motion. The jury found Jones guilty of aggravated battery, battery, and domestic battery, but not guilty of kidnapping. Jones now appeals and presents the sole issue of whether the trial court abused its discretion in denying the State and Jones' joint motion for a mistrial due to suspected jury taint. Concluding the trial court did not abuse its discretion, we affirm.

# Facts and Procedural History[1]

Jones and Ashley Glover had been in a relationship for "[f]ive years on and off." Transcript, Volume II at 115. On September 9, 2016, Jones and Glover were at Jones' house and both had been drinking and using drugs. While in the bedroom, the two got into an argument and Glover got her phone and attempted to call someone. Jones "snatched the phone out of [Glover's] hand and threw it." *Id*. at 120. Glover gathered her things and said, "Well, I'm going to go. I'll call you. Call me when you cool down." *Id*. Jones responded, "You think you [sic] going to walk out of this door, this will be the last door you walk out of." *Id*. Jones then hit Glover in the face. Glover stood up and realized she had been cut on her leg and she began to bleed "uncontrollably." *Id*. at 121. She fell to the ground and crawled to the bed to get her phone to call 911. She lost consciousness. The next thing Glover remembered was that Jones returned to the room, grabbed her arms, and began to drag her to the porch. She thought he dragged her to the front room and "didn't know that [she] was outside . . . until the paramedics came." *Id*. at 122. Glover had injuries to her face and lost a significant amount of blood and was taken by ambulance to Eskenazi Hospital where she underwent surgery, but ultimately survived.

---

[1] We held an oral argument on March 19, 2019 at the Hammond Academy of Science and Technology in Hammond, Indiana. We thank the students, faculty, and staff for their hospitality and gracious reception and commend counsel on their effective advocacy.

On September 14, 2016, the State charged Jones with the following: Count I, aggravated battery, a Level 3 felony; Count II, kidnapping, a Level 6 felony; Count III, battery resulting in bodily injury, a Class A misdemeanor; and Count IV, domestic battery, a Class A misdemeanor. Later, the State added Count V, aggravated battery, a Level 3 felony, and alleged Jones was an habitual offender. On May 13, 2018, the State filed a motion to dismiss Count I, which the trial court granted. *See* Appellant's Appendix, Volume II at 107, 17.

A jury trial on the remaining counts began on May 14 and concluded on May 15. Following the voir dire process, a jury was selected, sworn, and recessed for a lunch break. As Juror 11 returned from lunch, he was approached by a person who identified himself as a member of Jones' family and mentioned something about self-defense. Juror 11 promptly told the bailiff, who in turn informed the court and counsel about the encounter. After the break, the court reconvened without the jury and the trial court informed the parties that a juror had been approached by someone. The trial court stated, "I was going to bring that juror out, talk to him, see what's going on and take it from there." Tr., Vol. II at 24. Juror 11 was called in to the courtroom and described the encounter:

> [Juror No. 11]: I was coming into the security and a gentleman just said, he said, "Oh, you're a juror." I said, "Yeah, Are you?" "No." He said, "My uncle's the Defendant," and then he kind of under his breath just said, "self-defense (inaudible)." Like something to that effect, kind of . . .

[Court]:          Okay.  And that is the extent of it?

[Juror No. 11]:   Yes.

[Court]:          Okay.  And then you parted ways and you
                  came up here?

[Juror No. 11]:   Yes.

[Court]:          . . . [D]o you think it will impact your ability
                  to be fair and impartial in this case?

[Juror No. 11]:   Yes.

* * *

[State]:          Sir, when you got back, did you talk to any of
                  the other jurors about that?

[Juror No. 11]:   Yeah, I did tell the other jurors that I might
                  be dispensed because someone came up and
                  spoke to me, and then I said, "It wasn't
                  anything bad," and then they're like, "No, we
                  don't want to hear it."  I'm like, "No, that's
                  not what I'm saying."  I just said, "It wasn't –
                  I don't want anybody to be scared."

* * *

[Defense]:        Did you happen to tell who said something to
                  you or just state it like that, that someone
                  approached you?

[Juror No. 11]:        I just said "someone."  That's it.

* * *

Juror No. 11 is removed from the presence of the courtroom[.]

[Court]:              Okay, discussions from the State?

[State]:              Judge, I think we're at a mistrial.  He told
                      that he was approached and then told all the
                      other jurors what happened, and I think that
                      that – we don't know how they're
                      interpreting it.  They could interpret it either
                      way.  I think regardless, there's going to be
                      something else in the jury room that's not
                      evidence.

[Court]:              Okay.

[Defense]:            I agree, Judge.  I mean, I don't know if it will
                      negatively impact my client.  I don't know if
                      there were other jurors that were in the line
                      that heard or witnessed.

*Id*. at 25-27.  After this discussion, the trial court explained, "I'm in the rare

position I don't think we're at a mistrial.  I'm willing to individually voir dire

jurors and see what they know, what they don't know.  I think we are in a

position to dismiss this juror, but I don't know if he's tainted this whole jury

pool."  *Id*. at 27.

[5]     Juror 11 was dismissed and escorted back to the jury room to gather his things. The trial court then called each juror individually into the courtroom to "see where their minds are and the way they feel about [what Juror 11 told them]." *Id*. at 28. Although all the prospective jurors were sworn in at the beginning of voir dire, the jurors were not placed under oath again during individual questioning regarding the communication at issue. All jurors were questioned in the presence of the observers in the gallery.

[6]     Juror 1 was informed by the trial court that a juror had been dismissed and asked if she knew why. She responded, "I just had heard that he had been spoken to by a family member" but "didn't catch" whose family. *Id*. at 29. Juror 1 stated she was not influenced by this and felt comfortable sitting on the jury. The trial court cautioned her "not [to] talk about what we've just discussed here . . . until we get going." *Id*. at 30. After the juror left, defense counsel expressed concern, stating "we already have a discrepancy. He said he didn't say who approached. [Juror 1] says it was by a family member." *Id*.

[7]     Juror 2 knew that Juror 11 had been dismissed because "[h]e was spoken to by the family of the accused[,]" but did not know what was said. *Id*. at 31. When asked whether it would impact her ability to serve, she stated "I don't think so, no." *Id*. at 32. She explained that when Juror 11 came back "[h]e was already in the room and he just said that he was approached by a family member" and recalled that every juror was in the room at the time, but she was "not totally certain." *Id*. Juror 2 stated she was comfortable sitting on the jury and the trial

court asked that she "not discuss what [they] just talked about with the jurors." *Id*.

[8] When Juror 3 was brought into the courtroom, she did not know a juror had been dismissed. The trial court asked if she heard Juror 11 say anything to the jury and she replied that she "didn't hear anything." *Id*. at 33. Juror 3 stated it would "not really" impact her ability to be fair and impartial and she was comfortable serving on the jury. *Id*. Before Juror 3 was removed, the trial court stated: "Please don't discuss what we talked about out here with the other jurors, for now anyway." *Id*. After Juror 3 was removed, defense counsel stated, "as soon as [the court] asked that question, she looked over at us and then she said she didn't hear anything, but the other jurors said everybody was in there." *Id*. at 34.

[9] Juror 4 knew a juror has been dismissed because "[s]omeone from the Defendant's party, family contacted him[,]" but did not know anything else. *Id*. When asked whether "dismissing that juror or what you heard about what was said or what you know" would impact his ability to be fair and impartial, he responded "I don't think so." *Id*. Juror 4 was comfortable being a juror in the case and the trial court "ask[ed] that [he] not discuss with the other jurors what [he] talked about here." *Id*. at 35.

[10] Juror 5 was also aware a juror had been dismissed: "He said a family member talked to him. He did not tell us why, because I didn't want to know, because no one talked to me so I was good." *Id*. at 36. Juror 5 stated she was

comfortable serving on the jury and the interaction did not impact her ability to be fair and impartial. The trial court asked that Juror 5 "not discuss what we talked about here with the rest of the jury." *Id*.

[11] Next, Juror 6 was called into the courtroom. Juror 6 stated, "I heard in the jury room . . . that someone came up and talked to him." *Id*. at 37. He continued, "I didn't hear exactly what they said. It was a family member of the accused. He didn't really say what was said." *Id*. Juror 6 stated the incident did not impact his ability to sit on the jury and he could be fair and impartial. When the State asked, "[D]oes anything about what you heard make you uncomfortable sitting on this jury today?," he responded, "Not markedly . . . [s]omewhat but not very much." *Id*. at 38. The trial court asked what Juror 6 meant when he stated "somewhat[.]" *Id*. Juror 6 responded, "Well, I mean, I imagine an incident in my head – an impassioned plea on the part of a family member, but really, I didn't really hear much of what happened and I think it would be pretty easy for me to dismiss that image from my mind during deliberation." *Id*. He believed he could make a decision based on the facts of the case rather than the "the image in [his] mind." *Id*. Juror 6 was removed from the courtroom without being instructed not to discuss the conversation with other jurors.

[12] Juror 7 was aware Juror 11 had been dismissed because he was approached during lunch by a family member but did not know what was said. Juror 7 stated her ability to be fair and impartial was not impacted and she felt

comfortable sitting on the jury. Juror 7 was asked not to discuss the conversation in the courtroom with the other jurors.

[13] Juror 8 knew Juror 11 had been dismissed because "someone approached him" but he did not know who. *Id*. at 41. When asked whether he knew what was said when Juror 11 was approached, Juror 8 stated, "No. We told him, you know, say no more at that point." *Id*. He stated the incident would not impact his ability to be fair and impartial and he was comfortable sitting on the jury. The trial court did not admonish Juror 8 not to discuss the conversation.

[14] Juror 9 was called into the courtroom and questioned but did not know that a juror had been dismissed and had no knowledge of the incident. Juror 9 stated he could be fair and impartial. Juror 9 was asked not to discuss the conversation with the other jurors and was then returned to the jury room. Juror 10 was also unaware a juror had been dismissed, did not hear about the incident, and said he could be a fair and impartial juror. The trial court stated, "I ask that you not discuss . . . what we've talked about out here with the other jurors[.]" *Id*. at 43.

[15] After informing Juror 12 that a juror had been dismissed, Juror 12 guessed the juror was dismissed because "he had had contact with somebody . . . someone from the Defendant's family." *Id*. at 43-44. However, Juror 12 did not know what the individual said to Juror 11 and stated he could be a fair and impartial juror and was not uncomfortable sitting on the jury. The trial court did not admonish Juror 12 to refrain from discussing the conversation.

[16] Alternate Juror 1 was not aware a juror had been dismissed or of the incident. He stated he could be fair and impartial, and the trial court informed him that he was officially part of the jury and asked him not to discuss the conversation with the other jurors. Alternate Juror 2 was the remaining and now only alternate. When called into the courtroom, she stated that she was aware a juror had been removed because "somebody talked to him." *Id*. at 46. She did not know what was said but felt she could be a fair and impartial juror and was comfortable sitting on the jury. Alternate Juror 2 was returned to the jury room without the trial court asking her not to discuss the conversation.

[17] After each juror was individually questioned, the following colloquy ensued:

> [State]: I don't think that changes my position. . . . [One juror] said that it would make him somewhat uncomfortable and he said he thinks he can set it aside but he still expressed concern.
>
> [Another juror] . . . was looking directly at the Defendant's family and the entire time she is telling us she didn't hear anything and didn't know anything.
>
> I think it's somewhat unfair to ask these jurors to sit and listen to evidence for two days knowing that someone was approached. I know that would make me uncomfortable, and I definitely wouldn't probably say that, but I would just have concerns that even if they want to be on this jury and they want to be fair and impartial and they want to say they're fine with it, it's still asking them to kind of

take something back to the jury room with them that's not in evidence.

And I would be concerned that if the State secured a conviction on this case, it would be a ripe issue for appeal.

[Court]: Okay.

[State]: And it would be back here again. And this case is old, I get it. I'm the fourth prosecutor on it. I am so ready to get it over with. [The victim] is so ready to get this over with. I just don't – [Jones] is ready to get this over with, and I want to make sure that we are giving all parties a fair trial that is deserved.

So that is my record. I would have concerns after this that the jury is going to be focused on other issues.

* * *

[Defense]: I agree, Judge. I don't – regardless of what was stated here as you polled the jury, I believe the jury has been tainted. I don't think all of the jurors were actually honest about – I mean, some jurors said he told everybody, some jurors said they didn't hear anything. I know the Court said that's possible, but they're all discussing – human nature, they're discussing the issues, especially being polled.

I think my client is at a disadvantage. You know, while they're considering hearing the evidence, there may – human nature, be looking out in the

audience to see if they can read individuals' [sic] in the audience position, and I just think it's going to – my client is disadvantaged, is biased, I agree with the State.

And I know my client would, if we are not successful, would be appealing on this very issue, especially because of the record that's being made. We believe that the pool has been tainted.

[Court]:   Okay.  All right.  Counsel both have made their record.  I guess I still stand against it.  After talking to all the jurors, I don't think that the initial was sufficiently egregious to warrant a mistrial.  I think talking to the jurors gave me more . . . confidence that those who were aware of it are not disturbed by it.

We've had other juries where jurors have been, you know, exposed to various things.  I don't think this rises to those levels.  I can't think of any in particular, but they did not warrant a mistrial.  I don't believe the circumstances under this case as I understand them to be warrant a mistrial.

So I appreciate the argument of counsel, both state and defense.  The mistrial is denied and we'll proceed.

*Id*. at 46-49.[2]  After a recess, the trial court admonished the gallery: "We, obviously, had an incident involving someone in the gallery.  I don't know if it was the folks here or someone that's not here, but you can't interact with the jurors.  You just can't do it.  It puts everything at jeopardy for no reason.  It usually harms the people you intend to help, so however well-intentioned it may be, it just can't be done."  *Id*. at 50.  The State requested the trial court admonish the jury as well, but the trial court declined the request and stated, "I think we reviewed it sufficiently with the jury.  I may speak to it briefly, but it will not be in the form of an admonishment."  *Id*.

[18]  The trial commenced.  At the end of the first day of trial, the State again addressed its concern of jury taint: "The entire trial today, through all of the evidence, the Defendant's family has been speaking, making comments.  If I can hear it, the jury definitely can.  They can see it.  Specifically when the Court is sustaining State's objections, they are reacting.  Given the issues that we have already had today, I am really concerned at how this is affecting the jury and that its [sic] not being addressed."  *Id*. at 161-62.  The trial court then addressed the gallery and asked everyone to keep their thoughts to themselves or they would be removed.

[19]  Following the two-day trial, the jury found Jones guilty of Counts III through V, namely battery resulting in bodily injury, domestic battery, and aggravated

---

[2] The Chronological Case Summary ("CCS") indicates that, on May 14, a motion for mistrial was orally and jointly made by defense counsel and the State.  *See* Appellant's App., Vol. II at 17.

battery. The jury found Jones not guilty of Count II, kidnapping. On May 24, the trial court held a sentencing hearing where Jones stipulated that he was an habitual offender. *See* Tr., Vol. III at 60. Jones received one year each for Counts III and IV, to be served concurrently; nine years for Count V, aggravated battery, to run consecutively to the sentences for Counts III and IV. The sentence for Count V was enhanced by ten years for the habitual offender finding for a total of twenty years in the Indiana Department of Correction. *See id.* at 73; Appealed Order at 1. Jones now appeals.

# Discussion and Decision

## I. Standard of Review

[20] In order to prevail on appeal from the denial of a motion for mistrial, a defendant must establish that the questioned information or event was so prejudicial and inflammatory that he or she was placed in a position of grave peril to which he or she should not have been subjected. *Bisard v. State*, 26 N.E.3d 1060, 1068 (Ind. Ct. App. 2015), *trans. denied*. "The gravity of the peril is determined by the probable and persuasive effect on the jury's decision." *Id*. A trial court is in the best position to evaluate whether a mistrial is warranted "because it can assess first-hand all relevant facts and circumstances and their impact on the jury." *Ramirez v. State*, 7 N.E.3d 933, 935 (Ind. 2014). We, therefore, review a trial court's decision to deny a motion for a mistrial for an abuse of discretion. *Id*. An abuse of discretion occurs when the trial court's

decision is clearly against the logic and effect of the facts and circumstances before the court. *Vaughn v. State*, 971 N.E.2d 63, 68 (Ind. 2012).

## II. Motion for Mistrial

"An impartial jury is the cornerstone of a fair trial, guaranteed by the Sixth Amendment and Article 1, Section 13 of our Indiana Constitution." *Ramirez*, 7 N.E.3d at 936. To preserve impartiality and prevent taint, we prohibit unauthorized contacts and communications with jurors. *Id*. "Yet, no trial is perfect, and we have long held that [w]hile courts have a duty to ensure an impartial jury . . . jurors need not be absolutely insulated from all extraneous influences." *Id*. (quotation omitted). Therefore, a trial court is entrusted with the difficult responsibility of determining when extraneous influences become irreparable taint warranting a new trial. *Id*. We acknowledge that a mistrial is "an extreme remedy warranted only when no other curative measure will rectify the situation." *Bisard*, 26 N.E.3d at 1067-68.

Our supreme court recently clarified the proper procedure for trial courts to follow in instances of juror misconduct. A defendant who moves for a mistrial due to suspected jury taint is entitled to a presumption of prejudice only upon showing, by a preponderance of the evidence,[3] that: (1) extra-judicial contact or communications between jurors and unauthorized persons occurred, and (2) the

---

[3] Preponderance of the evidence "simply means the greater weight of the evidence." *Kishpaugh v. Odegard*, 17 N.E.3d 363, 373 (Ind. Ct. App. 2014) (internal quotations omitted).

contact or communications pertained to the matter before the jury. *Ramirez*, 7 N.E.3d at 939 (citing *Currin v. State*, 497 N.E.2d 1045, 1046 (Ind. 1986)). Once a defendant makes these two showings, the burden shifts to the State to rebut this presumption of prejudice by demonstrating that any contact or communications were harmless, *id.,* namely that the defendant was convicted by an impartial jury, *Wahl v. State*, 51 N.E.3d 113, 116 (Ind. 2016) (noting the constitutional right to an impartial jury is "so basic to a fair trial its infraction can never be treated as harmless error."). If the State does not rebut this presumption, the trial court is required to grant the defendant a new trial. *Ramirez*, 7 N.E.3d at 939. Additionally, our supreme court explained:

> Trial courts must immediately investigate suspected jury taint by thoroughly interviewing jurors collectively and individually, if necessary. If any of the jurors have been exposed, he must be individually interrogated by the court outside the presence of the other jurors, to determine the degree of exposure and the likely effect thereof. After each juror is so interrogated, he should be individually admonished. After all exposed jurors have been interrogated and admonished, the jury should be assembled and collectively admonished, as in the case of a finding of "no exposure." If the imperiled party deems such action insufficient to remove the peril, he should move for a mistrial.

*Id*. at 940 (quotation omitted).

[23] However, if the defendant fails to meet the two-part showing, the presumption of prejudice is inapplicable and the trial court must apply the probable harm standard for juror misconduct, in which a new trial should be granted only if the misconduct is "gross and probably harmed" the defendant. *Id*. at 939. In

egregious cases, in which juror conduct "fundamentally compromises the appearance of juror neutrality," the trial court should skip the two-part test, find irrebuttable prejudice, and declare a mistrial. *Id*. "At all times, trial courts have discretion to decide whether a defendant has satisfied the initial two-part showing necessary to obtain the presumption of prejudice or a finding of irrebuttable prejudice." *Id*. This standard is applicable whenever a defendant seeks a mistrial due to suspected jury taint, regardless of when the alleged taint occurred. *Wahl*, 51 N.E.3d at 116.

[24] Jones maintains the two-part inquiry has been met here and he was therefore entitled to a presumption of prejudice. Jones then goes on to argue that because the State failed to rebut the presumption and "actively sought to establish the jury was not impartial[,]" it cannot demonstrate harmlessness. Brief of the Appellant at 30. The State does not challenge that Jones has met the two-part inquiry. The State repeatedly expressed concern at trial that the jury might not be impartial due to the extra-judicial communication and moved for a mistrial, but on appeal it argues that the trial court did not abuse its discretion in denying the motion for a mistrial because the extra-judicial contact was harmless and Jones was convicted by an impartial jury. Brief of Appellee at 12. "If the State is able to demonstrate that a jury was impartial, the presumption of prejudice is rebutted and the contact or communications can be treated as harmless." *Wahl*, 51 N.E.3d at 116.

[25] Our court's decision in *Bisard* guides our analysis in this case. During Bisard's operating while intoxicated trial, Juror 8-2 conducted an internet search

regarding the instruments used to analyze blood samples for alcohol and reversals in another state. Juror 8-2 shared this information with the other jurors.

> As soon as the trial court learned of Juror 8-2's misconduct, the court brought Juror 8-2 into the courtroom and inquired into his actions. Juror 8-2 admitted to conducting independent research and informed the court of his findings. The trial court immediately removed Juror 8-2 from the jury and had him escorted from the building. The trial court then summoned the remaining jurors, one at a time, into the courtroom, where the trial court questioned each of them about what they knew of Juror 8-2's actions. Some of the jurors knew nothing of Juror 8-2's conduct. Those jurors who were somewhat aware of what Juror 8-2 had done assured the trial court that they could set aside anything they had heard and decide the case based solely on the evidence they had heard or had seen in the courtroom.
>
> * * *
>
> . . . Based on its questioning of the jurors, the jurors' assurances that they could decide the case on the evidence presented in the courtroom, in conjunction with its assessment of the jurors' demeanor, the trial court determined that it was "perfectly comfortable" with allowing the jury to begin deliberations. Given the trial court's assessment that the dismissal of Juror 8-2 removed any taint on the jury, the State was not put in the position to have to present additional evidence demonstrating that Juror 8-2's conduct was harmless.

26 N.E.3d at 1069. Therefore, the trial court's dismissal of Juror 8-2 was sufficient to remove any taint. The State did not dispute that misconduct occurred or that it pertained to an issue before the jury; therefore, the defendant

was entitled to a presumption of prejudice and the burden shifted to the State to rebut the presumption pursuant to *Ramirez*. However, the court explained that based on the trial court's assessment that the juror's dismissal removed any taint, the State was not put in the position of demonstrating additional evidence that the contact was harmless. *Id.* Similarly here, the trial court ultimately determined the extra-judicial communication was essentially harmless and it did not merit the extreme measure of a mistrial. In fact, the trial court stated it was confident that the jurors who were aware of the incident were not influenced by it.

[26] Moreover, the evidence in the record establishes that the jury was impartial. After Juror 11 was removed, each remaining juror indicated that the incident would not impact their ability to be impartial and felt comfortable sitting on the jury. The record also reveals that none of the jurors knew the content of the communication.

[27] We acknowledge that the trial court did not place the jurors under oath during questioning, it failed to provide consistent admonishments or in some cases failed to provide an admonishment altogether, and the individual questioning transpired in the presence of those in the gallery. The record also establishes that there were inconsistencies between Juror 11's statement regarding the information he relayed to the other jurors and statements by several jurors about what they heard. Ultimately, however, we must determine whether these failures of the trial court and inconsistencies between the juror's statements warrant a mistrial. We conclude they do not. Although a defendant is

constitutionally entitled to a trial by an impartial jury, "no trial is perfect[.]" *Ramirez*, 7 N.E.3d at 936. Because the trial court is in the best position to view the jurors, assess their credibility, and "gauge the surrounding circumstances of an event and its impact on the jury," *Bisard*, 26 N.E.3d at 1069, it is entrusted with the difficult responsibility of determining when extraneous influences become irreparable taint warranting a new trial, *Ramirez*, 7 N.E.3d at 936. Here, the trial court questioned each juror individually, determined they were impartial, and confidently denied the parties' motion for a mistrial. Therefore, we will not second-guess the trial court's determination that the "extreme remedy of a mistrial was unnecessary here." *Woods v. State*, 98 N.E.3d 656, 672 (Ind. Ct. App. 2018), *trans. denied*; *see also Bisard*, 26 N.E.3d at 1069.

# Conclusion

[28] Because the trial court properly removed Juror 11 and the remaining jurors indicated they could be impartial, we conclude that the trial court's determination that the extreme remedy of a mistrial was unnecessary is supported by the record and therefore, was not an abuse of discretion. Accordingly, we affirm.

[29] Affirmed.

Riley, J., concurs.

Mathias, J., dissents with separate opinion.

| | |
|---|---|
| Kevin Jones, | Court of Appeals Case No. |
| *Appellant-Defendant,* | 18A-CR-1320 |
| v. | |
| State of Indiana, | |
| *Appellee-Plaintiff.* | |

**Mathias, Judge, dissenting.**

Because I believe that the trial court abused its discretion by denying the State's and Jones's joint request for a mistrial, I respectfully dissent.

As set forth by the majority, a defendant is entitled to a presumption of prejudice if he or she shows by a preponderance of the evidence that extra-judicial contact or communications between jurors and unauthorized persons occurred and that the contact or communications pertained to the matter before the jury. *Ramirez*, 7 N.E.3d at 939 (citing *Currin*, 497 N.E.2d at 1046). The State acknowledges on appeal that Jones met this burden, as the evidence clearly

shows that one of Jones's family members contacted Juror 11 and spoke to him about the case against Jones. It was then the State's burden to rebut this presumption of prejudice. *Id.* But here, the State made no attempt at trial to meet this burden because it too requested a mistrial.[4] And the efforts by the trial court to ensure that the jury was untainted by the contact fell short of rebutting this presumption of prejudice.

[32] The trial court rightly dismissed Juror 11, who had been contacted by Jones's relative. But when the trial court questioned the remaining jurors, it failed to place them under oath as required by Indiana Jury Rule 24, and it inconsistently admonished the jurors with regard to the propriety of discussing the incident amongst themselves. The trial court also denied the State's request to admonish the jury as a whole.

[33] Furthermore, after Juror 11 was removed, five of the remaining jurors gave what I consider to be only half-hearted assurances as to whether the incident with Juror 11 would impact their ability to act as jurors. When asked if she felt comfortable sitting on the jury after the incident with Juror 11, Juror 1 stated, "I believe so." Tr. Vol. 2, p. 30. Although Juror 2 stated that the she felt she could be fair and impartial, when asked if the incident with Juror 11 had an impact on her, Juror 2 replied, "I don't think so, no." *Id.* at 31–32. Juror 3 stated that the

---

[4] I do not mean to suggest that a trial court must always grant a request for mistrial that is joined by both parties. But the fact that both parties here requested a mistrial indicates that neither party felt that the jury was untainted. And the State made no effort at trial to rebut the presumption of prejudice.

incident with Juror 11 would "not really" impact her ability to be fair and impartial. *Id*. at 33. And when asked if dismissing Juror 11 for the extra-judicial communications Juror 11 had with Jones's family member would impact his ability to be fair and impartial, Juror 4 stated, "I don't think so." *Id*. at 34. And although Juror 6 stated that the incident would not impact his ability to be fair and impartial, when asked if the incident made him uncomfortable to be on the jury, he replied, "Not markedly . . . [s]omewhat but not very much." *Id*. at 38. None of these are exactly unequivocal responses.

[34] After the jurors were individually questioned, the State still maintained the need for a mistrial, noting that Juror 6 stated that he would be "somewhat" uncomfortable sitting on the jury and that another juror had been looking at Jones's family while being questioned. *Id*. at 47. The defense noted that there was also some inconsistency among the remaining jurors as to whether they had heard Juror 11 tell them what had happened. Still, the trial court decided not to declare a mistrial.

[35] Given the procedural irregularities governing the questioning of the jurors and the equivocal responses of several of the jurors regarding the effect the incident involving Juror 11 had on their ability to comfortably sit as jurors, I must conclude that the presumption of prejudice was not rebutted. Indeed, as noted, at trial, the State made no attempt to rebut the presumption because it too believed a mistrial was required. Accordingly, I would hold that the trial court abused its discretion by denying the State's and defense's joint requests for a mistrial, and I would reverse Jones's convictions and remand for a retrial.